**CASE NO. 12-1416**

# UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

LAWRENCE DODGE,
Petitioner,

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,
Respondent.

---

On Petition for Review of an Order of the Office of the Comptroller of the
Currency, United States Department of the Treasury

Agency Case No. OTS AP 10-03

---

**PETITIONER'S OPENING BRIEF**

---

CASE BEING CONSIDERED FOR TREATMENT
PURSUANT TO RULE 34(j) OF THE COURT'S RULES

THOMAS L. VINCENT, Cal Bar No. 149729
PAYNE & FEARS LLP
4 Park Plaza, Suite 1100
Irvine, California 92614
(949) 851-1100 • Fax: (949) 851-1212

Attorneys for PETITIONER LAWRENCE
DODGE

## CERTIFICATE AS TO PARTIES, RULING AND RELATED CASES

### A.     Parties and Amici

The parties in these challenged agency proceedings – specifically, proceedings before the Office of Thrift Supervision ("OTS") and then, following OTS's transfer of functions to the Office of the Comptroller of the Currency ("OCC"), before the OCC – are, in accord with 12 U.S.C. § 5412(B)(2)(b):

- Lawrence K. Dodge; and

- OCC

Both Mr. Dodge and the OCC are parties in this Court.

### B.     Rulings Under Review

The rulings under review in this Petition are the Final Decision and Order ("the Final Decision" or "FD"), in Case No. OTS AP 10-03 (including its attached Order of Prohibition and Assessment of a Civil Monetary Penalty), which will be attached to the deferred appendix under F.R.A.P. 30(c), but is also attached as Exhibit A to Mr. Dodge's Petition for Review.  The Petition encompasses the Recommended Decision (or "RD") issued on November 1, 2011.  We are aware of no official citation for either the Final Decision or Recommended Decision.

### C.     Related Cases

This case has not previously been before this Court or any other Court. There are no cases pending before this Court or any other court that are related to this case.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULING AND RELATED CASES................. i

    A.    Parties and Amici ........................................................................ i

    B.    Rulings Under Review ................................................................. i

    C.    Related Cases............................................................................... i

I.     JURISDICTIONAL STATEMENT .................................................... 1

II.    ISSUES PRESENTED FOR REVIEW ............................................... 1

III.   ADDENDUM ....................................................................................... 3

IV.   STATEMENT OF THE CASE ............................................................ 3

V.    STATEMENT OF FACTS .................................................................. 4

    A.    The Relevant Regulatory Framework's Lack of Clarity...................... 5

        1.    The Accounting Challenges Posed by Post-Period
             Adjustment ................................................................... 5

        2.    The New Directions Bulletin's Impact on "Cash
             Equivalents" and the Handling of Post-Period
             Adjustments................................................................... 6

        3.    The Office of Inspector General's Concerns About OTS........... 8

    B.    The Brewing Mortgage Storm's First Impacts on ASB and
        ASB's Efforts to Address It with OTS ................................................ 9

        1.    The Republican Party Loan Participation and
             Intercompany Receivable for a Charged-Off Loan ................... 9

        2.    ASB Accounts for Another $750,000 in Intercompany
             Receivables............................................................... 11

3.      ASB's Holding Company's Strong Asset Position, Including Money Market Funds Held With ASB .................. 12

C.     ASB and Mr. Dodge First Become Aware of a Potential Issue Due to the Outstanding Amounts Owed ........................... 12

D.     The Harbingers of a Systemic Meltdown Begin to Crowd Out the View ........................................................................... 13

E.     Mr. Dodge Reaches Out to OTS on the Impending Capital Challenges Posed by the Mortgage Market Meltdown ..................... 14

F.     ASB Utilizes the Approach to Valuing Its Mortgage Pipeline Disclosed as Part of Its 2007 Capital Plan for Its Mountain View Relationship ...................................................................... 14

G.     OTS Takes Issue With the First Three Capital Transactions ............ 17

H.     Mr. Dodge Causes ASB's Holding Company to Inject More than the Statutory Maximum .................................................. 17

I.     The Hearing Testimony Elicited From OTS's Witnesses ................. 19

1.      The Testimony of Those Involved With ASB and the Implementation of the Four Transactions ................................. 19

2.      The May 2008 Audit .................................................... 22

3.      The Testimony of OTS's Personnel and John Kopecky .......... 23

4.      Information Shared with the Board and Disagreements Over the Mountain View Transaction ....................................... 26

5.      Brokered Deposits and Liquidity ........................................... 26

VI.     SUMMARY OF ARGUMENT ........................................................... 28

VII.    STANDING ................................................................................. 30

VIII.   STANDARD OF REVIEW ................................................................ 30

IX.     NEITHER THE LAW NOR SUBSTANTIAL EVIDENCE SUPPORTS THE PROHIBITION RULING ................................................ 32

iii

A.   The Final Decision Cannot Be Reconciled with 12 U.S.C. § 1818(e)(1)(B)'s Effect Test or the Evidence as a Whole .................. 32

  1.   Both the Bank and Depositor Harm Provisions Require That Harm Be Likely, Not Just Theoretically Possible ........... 33

  2.   The Financial Gain Finding Also Violates the APA ............... 36

B.   The Final Decision Cannot Be Reconciled with 12 U.S.C. § 1818(e)(1)(C)'s Culpability Test or the Evidence as a Whole ........... 39

  1.   The Proper Handling of Period-End Capital Infusions Like the First Three Capital Transactions Was Not Clear ....... 40

  2.   The Record Points in One Direction: Mr. Dodge Honestly Believed the Transactions Were Handled Properly .................................................................................... 43

  3.   Mr. Dodge's Belief Was Reasonable and His Actions Completely Inconsistent with Scienter ................................... 44

  4.   There Was No Evidence that Mr. Dodge "With Full Knowledge" Manipulated the Capital Accounts or Exhibited Any Personal Dishonesty ........................................ 46

  5.   The Final Decision Is Predicated on Accumulated Errors ....... 47

  6.   The Mountain View Ruling Suffers the Same Fatal Flaws ..... 49

  7.   Conclusion ................................................................................. 52

C.   All The Misconduct Determinations That Rely on Scienter or Duty Determinations Also Suffer From the Same Fatal Problems ............................................................................................ 53

  1.   All Misconduct Findings Requiring a Culpable State of Mind Were Improper Under the APA ..................................... 53

  2.   Any Misconduct Findings Premised on OTS' Own Regulations or Other Publications Also Violate the APA ....... 54

X.   NEITHER THE LAW NOR SUBSTANTIAL EVIDENCE SUPPORTS THE CIVIL MONETARY PENALTIES ................................ 55

iv

A.    The Final Decision Cannot Be Reconciled with 12 U.S.C. § 1818(i)(2)(B)(ii)'s Effect Requirements or the Evidence as a Whole .................................................................................... 56

B.    The Final Decision Cannot Be Reconciled with 12 U.S.C. § 1818(i)(2)(B)(i)'s Misconduct Requirements or the Evidence as a Whole ....................................................................... 57

C.    Without Multiple Misconduct Findings, There Can Be No "Pattern of Misconduct" ............................................................. 58

D.    The Civil Monetary Penalty Is Rendered Arbitrary and Capricious in Light of the $20 Million Capital Injection ................... 58

XI.    CONCLUSION ............................................................................... 59

# TABLE OF AUTHORITIES*

**Page**

**FEDERAL CASES**

*Advent Electronics, Inc. v. Buckman,*
918 F. Supp. 260 (N.D. Ill. 1996) ..................................................... 48

*Affum v. United States,*
566 F.3d 1150 (D.C. Cir. 2009) ........................................................ 30

*Bank of New York v. FDIC,*
453 F. Supp. 2d 82 (D.D.C. 2006) .................................................... 31

*Brickner v. FDIC,*
747 F.2d 1198 (8th Cir. 1984) .......................................................... 39

*Cablevision Sys. Corp. v. FCC,*
649 F.3d 695 (D.C. Cir. 2011) .......................................................... 32

*Consolidated Edison Co. v. NLRB,*
305 U.S. 197 (1938) ........................................................................... 31

*De La Fuente v. FDIC,*
332 F.3d 1208 (9th Cir. 2003) ..................................................... 38, 39

*DeNaples v. Office of Comptroller of Currency,*
706 F.3d 481 (D.C. Cir. 2013) .......................................................... 31

* *Doolittle v. Nat'l Credit Union Admin.,*
992 F.2d 1531 (11th Cir. 1993) .............................................. 39, 47, 52

*Grubb v. FDIC,*
34 F.3d 956 (10th Cir. 1994) ............................................................ 39

*Hutensky v. FDIC,*
82 F.3d 1234 (2d Cir. 1996) .............................................................. 48

* *Kaplan v. OTS,*
104 F.3d 417 (D.C. Cir. 1997) ................................................ 34, 36, 40

* *Kim v. OTS,*
40 F.3d 1050 (9th Cir. 1994) ..................................................... 32, 40

*Authorities upon which we chiefly rely are marked with asterisks

vi

*Landry v. FDIC*,
    204 F.3d 1125 (D.C. Cir. 2000) ............................................. 4, 31

*Louisiana Pacific Corp. v. Money Market 1 Institutional Inv. Dealer*,
    Case No. C-09-03529 JSW, 2011 WL 1152568 (N.D. Cal. Mar. 28,
    2011) ......................................................................................... 5

*Loumiet v. OCC*,
    650 F.3d 796 (D.C. Cir. 2011) ............................................... 34

* *Michael v. FDIC*,
    687 F.3d 337 (D.C. Cir. 2012) ........................................ 32, 39, 46

* *Oberstar v. FDIC*,
    987 F.2d 494 (8th Cir. 1993) ................................................ 52

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (2011) ............................................................... 51

*Proffitt v. FDIC*,
    200 F.3d 855 (D.C. Cir. 2000) ........................................ 30, 31, 33

* *Rapaport v. OTS*,
    59 F.3d 212 (D.C. Cir.) .......................................................... 37

*Seidman v. OTS*,
    37 F.3d 911 (3rd Cir. 1994) .................................................. 54

*Siegel v. SEC*,
    592 F.3d 147 (D.C. Cir. 2010) .............................................. 31

*Simpson v. OTS*,
    29 F.3d 1418 (9th Cir. 1994) ................................................ 58

*Skirlick v. Fidelity & Deposit Co. of Maryland*,
    852 F.2d 1376 (D.C. Cir. 1988) ............................................ 39

*Steadman v. SEC*,
    450 U.S. 91 (1981) ................................................................. 31

*United Western Bank v. OCC*,
    -- F. Supp. 2d --, 2013 WL 796021 (D.D.C. Mar. 5, 2013) ............ 34

\*Authorities upon which we chiefly rely are marked with asterisks

* *Wachtel v. OTS*,
    982 F.2d 581 (D.C. Cir. 1993) ........................................................ 31, 36, 37, 45

FEDERAL STATUTES

5 U.S.C. § 706(2)(A) .......................................................................... 31

5 U.S.C. § 706(2)(E) .......................................................................... 30

12 U.S.C. § 1464(d)(1)(A) .................................................................... 1

12 U.S.C. § 1818 ............................................................................ 1, 32

12 U.S.C. § 1818(b)(6)(A) .................................................................... 37

12 U.S.C. § 1818(e) .......................................................................... 53, 57

12 U.S.C. § 1818(e)(1) ...................................................................... 39, 56

12 U.S.C. § 1818(e)(1)(A) .................................................................... 32

12 U.S.C. § 1818(e)(1)(B) ................................................................ 1, 32, 35

*12 U.S.C. § 1818(e)(1)(B)(i) ................................................................ 33

*12 U.S.C. § 1818(e)(1)(B)(ii) ............................................................... 33

*12 U.S.C. § 1818(e)(1)(B)(iii) ........................................................... 33, 36

12 U.S.C. § 1818(e)(1)(C) ................................................................ 1, 32, 39

*12 U.S.C. § 1818(e)(1)(C)(i) ................................................................ 39

*12 U.S.C. § 1818(e)(1)(C)(i) ................................................................ 39

12 U.S.C. § 1818(h) .......................................................................... 30

12 U.S.C. § 1818(h)(1) ........................................................................ 1

12 U.S.C. § 1818(h)(2) ........................................................................ 1

12 U.S.C. § 1818(i) .......................................................................... 56, 57

12 U.S.C. § 1818(i)(2)(A) .................................................................... 57

*Authorities upon which we chiefly rely are marked with asterisks

12 U.S.C. § 1818(i)(2)(B) ................................................................ 55

12 U.S.C. § 1818(i)(2)(B)(i) .......................................................... 1, 57

12 U.S.C. § 1818(i)(2)(B)(i)(I) ......................................................... 57

*12 U.S.C. § 1818(i)(2)(B)(i)(II) ...................................................... 57

12 U.S.C. § 1818(i)(2)(B)(i)(III) .................................................. 57, 58

*12 U.S.C. § 1818(i)(2)(B)(ii)(I) ...................................................... 55

*12 U.S.C. § 1818(i)(2)(B)(ii)(II) ................................................. 55, 56

*12 U.S.C. § 1818(i)(2)(B)(ii)(III) ................................................ 55, 56

12 U.S.C. § 1818(i)(2)(B)(ii) ........................................................... 56

* 12 U.S.C. § 1831o(e)(2)(E) ........................................................ 3, 59

* 12 U.S.C. § 1831o(e)(2)(E)(i) ....................................................... 17

12 U.S.C. § 5412(a)(2)(B) ............................................................. i, 1

18 U.S.C. § 1005 ....................................................................... 3, 53

Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. § 1376 (2010) ........................ 1

Financial Institutions Reform, Recovery, & Enforcement Act, Pub. L. No.
    101-73, 103 Stat. 183 (1989) ........................................................ 33

## REGULATIONS

12 C.F.R. § 163.180(b)(1) ............................................................. 53

12 C.F.R. § 561.1 ....................................................................... 3

12 C.F.R. § 562.2 ....................................................................... 3

12 C.F.R. § 565.4 ....................................................................... 9

## CONSTITUTIONAL PROVISIONS

U.S. CONSTITUTION, ART. III ......................................................... 30

*Authorities upon which we chiefly rely are marked with asterisks

**OTHER AUTHORITIES**

http://www.treasury.gov/tigta/auditreports/2013reports/201310053fr.pdf ............ 49

\*Authorities upon which we chiefly rely are marked with asterisks

## GLOSSARY

APA .......................................................................... Administrative Procedure Act

GAAP ....................................................... Generally Accepted Accounting Principles

RFJN.................................................................................. Request for Judicial Notice

OCC....................................................... Office of the Comptroller of the Currency

OTS ............................................................................. Office of Thrift Supervision

FD.................................................................................................... Final Decision

RD ..................................................................................... Recommended Decision

PR...................................................................................................... Petition for Review

TFR.................................................................................. Thrift Financial Report

ASB .................................................................................. American Sterling Bank

Tr. .......................................................................................................... Transcript

Ex. ..............................................................................................................Exhibit

CASE BEING CONSIDERED FOR TREATMENT
PURSUANT TO RULE 34(j) OF THE COURT'S RULES

## I.     JURISDICTIONAL STATEMENT

OTS initially had jurisdiction under 12 U.S.C. § 1464(d)(1)(A) (2009).

Following passage of the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. § 1376

(2010), jurisdiction transferred to OCC under 12 U.S.C. § 1464(d)(1)(A) and 12

U.S.C. § 5412(a)(2)(B).  Agency jurisdiction also exists under 12 U.S.C. §

1818(h)(1).

This Court has jurisdiction under 12 U.S.C. § 1818(h)(2).  The Final

Decision was served on September 19, 2012 and this Petition was timely filed on

October 16, 2012.  (Petition for Review ("PR") at 1; *id.*, Ex. A.)

## II.     ISSUES PRESENTED FOR REVIEW

1.     Whether the record as a whole and applicable law support the

conclusion that there was an adverse effect under 12 U.S.C. § 1818(e)(1)(B),

where: (a) there was **no loss**; (b) Lawrence Dodge invested far more than the

statutory cap; and (c) ASB's holding company had the resources to and promptly

did correct any capital accounting mistakes.

2.     Whether the record as a whole supports the conclusion that Lawrence

Dodge had a culpable state of mind under 12 U.S.C. § 1818(e)(1)(C) or 12 U.S.C.

§ 1818(i)(2)(B)(i), particularly in light of: (a) confusion about applicable

accounting principles by those who dealt with Mr. Dodge and OTS generally; (b)

ASB's disclosures to OTS; (c) Mr. Dodge's belief as to what was done; and (d) his investment of more than $20 million into ASB.

3.    Whether the record as a whole and applicable law demonstrate that the Final Decision is arbitrary and capricious; contrary to law; or lacks substantial evidence.

4.    Whether the Final Decision violated the APA in imposing either a prohibition order and/or civil monetary penalties.

5.    Whether the Final Decision violated the APA in any of its conclusions concerning proposed violations of law and/or regulations.

6.    Whether OTS established by substantial evidence that Lawrence Dodge personally benefited or was otherwise somehow unjustly enriched by the challenged transactions.

7.    Whether OTS established by substantial evidence that the challenged transactions were either likely to harm the Bank or likely to harm depositors.

8.    Whether there was substantial evidence to support a finding that Lawrence Dodge had a culpable state of mind or knowledge of any falsity in any of the statements at issue, whether made by him or others.

9.    Whether the Final Decision violated the APA in failing to give sufficient consideration to the government's own contemporaneous treatment of

short-term notes and post-closing infusions for purposes of the standard of care and Mr. Dodge's state of mind.

## III.    ADDENDUM

Relevant statutes are provided in a separate Addendum.

## IV.    STATEMENT OF THE CASE

In a collapsing economy, rather than run away, Mr. Dodge effectively injected more than ***$20 million*** into American Sterling Bank ("ASB").  *See* infra at 17-18.  (*See also* FD at 5; RD at 11.)  This far exceeded the maximum of 5% of assets that could be sought under *any* capital restoration plan.  *See* 12 U.S.C. § 1831o(e)(2)(E); *see also* infra at 17-18 n.19.  Nevertheless, OTS noticed enforcement proceedings ("the Notice" or "Not.").  (Ex. 57.)

The Notice alleged Mr. Dodge's responsibility for improperly booking four capital transactions.  (Ex. 57-004-006.)   It also alleged violations of 12 C.F.R. §§ 561.1 and 562.2, claiming that the capital transactions failed to accord with TFR instructions, OTS guidance, and GAAP.  (Ex. 57-007.)  The Notice further alleged a violation of 18 U.S.C. § 1005; that these four transactions (all replaced with cash at OTS's request) constituted unsafe or unsound practices and a breach of fiduciary duties.  (*Id.*)  The Notice then alleged the ability to prohibit  and to impose civil monetary penalties of $2.5 million.  (*Id.*)

3

Mr. Dodge denied these charges.  (Ex. 58-002-004.)[1]  OTS Enforcement personnel later moved for summary disposition, which was denied.[2]  The subsequent hearing lasted four days.  (*See* Tr. 1, 246, 504, 766.)  After post-hearing briefs,[3] a Recommended Decision issued on November 1, 2011, recommending a prohibition order and a $1 million penalty.  (RD at 52.)  Mr. Dodge filed exceptions on December 1, 2011.[4]  A Final Decision adopting the recommendations was served on September 19, 2012.  (FD at 19.)  This Petition followed.  (PR at 1.)

## V.    STATEMENT OF FACTS

Under the substantial evidence standard, an agency must account for facts that favor a charged party as well as those favoring the agency.  *Landry v. FDIC*, 204 F.3d 1125, 1140 (D.C. Cir. 2000).  Accordingly, this statement seeks to set forth a balanced description of the full record, including the regulatory framework faced by Mr. Dodge.

---

[1] Unless noted otherwise all "Ex." cites are to OTS's exhibits.

[2] (*See* Mot. for Summ. Disposition; Br. in Support of Opp'n to OTS's Mot. for Summ. Disposition; Decl. of Lawrence Dodge in Support of Opp'n; Decl. of Leonard Lyons in Support of Opp'n; Order Denying OTS's Mot. for Summ. Disposition.)

[3] (Br. of Resp. Lawrence Dodge in Supp. of Resp'ts Proposed Findings of Fact & Conclusions of Law; Post Hrg. Br. of OTS; Br. of Resp't Lawrence Dodge in Opp'n to OTS's Proposed Findings of Fact & Conclusions of Law; Reply Br. of OTS.)

[4] (Lawrence Dodge's Exceptions to the Recommended Decision & Proposed Orders.)

4

## A.    The Relevant Regulatory Framework's Lack of Clarity

OTS treats the categories of "[c]ash," "[c]ash equivalents," and "[o]ther high quality, marketable assets" as forms of bank capital that a savings association "may accept without limit."[5]  (Ex. 29-001.)  The record contains no evidence of any identified statutory basis, OTS regulatory process, or agency publication prior to 2009 that either explained or further defined these general terms.[6]  (*See, e.g.*, Ex. 29-001.)  Nor is there evidence of OTS providing specific guidance regarding what "cash equivalents" meant *before or while* the events at issue took place.  In January 2009, several months *after* the last of the events giving rise to OTS' allegations, however, OTS issued a "New Directions Bulletin." (Ex. 31.)

### 1.    The Accounting Challenges Posed by Post-Period Adjustment

OTS's New Directions Bulletin discusses a general problem facing banks: calculations occurring only *after* a financial reporting period closes may reveal events occurred *during* the period that require adjusting a bank's capital.  (*See* Ex.

---

[5] In contrast, savings associations can "accept other forms of contributed capital if the association receives prior OTS Regional Director approval."  (OTS Ex. 29-001.)

[6] OTS's Patricia Hildebrand testified that an Emerging Issues Task Force ("EITF") Abstract specifically adopted standards reflected in OTS's later, 2009 directives.  (*See* Tr. 640:5-9.)  But this was inaccurate.  (*See* Req. for Jud. Not. ("RFJN"), Ex. B at 49-50.)

31-001.)  Again, prior to the New Directions Bulletin, the term "cash equivalents" was not specifically defined.[7]

If a holding company committed to providing capital was asset-rich, would a note qualify?  What difference might a short-term or a longer maturity make? Would a written promise to keep capital up be sufficient?  An inter-company receivable?  What of holding company funds already held by the bank?  Could or should any such transactions be back-dated?  Prior to 2009, OTS's official pronouncements were silent on these questions,[8] which the Bulletin recognizes came to the fore with the 2008 economic crisis's devastating impact on the home mortgage market.  (*See* Ex. 31-001.)

### 2.     The New Directions Bulletin's Impact on "Cash Equivalents" and the Handling of Post-Period Adjustments

The Bulletin addresses two kinds of capital contributions:  cash and notes. With respect to cash, the Bulletin recognizes that many capital adjustments will not become clear until after a period has ended, but also concludes institutions cannot

---

[7] Hildebrand testified to her understanding that "cash equivalents" included assets that could be converted to immediate cash.  (Tr. 640:23-641:18.)  Money market funds are traditionally given just such treatment.  *Cf. Louisiana Pacific Corp. v. Money Market 1 Institutional Inv. Dealer*, Case No. C-09-03529 JSW, 2011 WL 1152568, at *3 (N.D. Cal. Mar. 28, 2011) (describing money market investments as "cash equivalents").

[8] (*See* RFJN, Ex. A, at 27-28 (Inspector General addressing this silence).)

6

retroactively "fix" such adjustments via post-period cash infusions despite any funding commitments made to the institution. (*See* Ex. 31-001-002.)

As for notes, the Bulletin recognizes that a holding company note ***can*** be used to bolster capital even if not paid before period-end. (Ex. 31-002.) A number of requirements are imposed, however. First, the note must be issued on or before the reporting period's last day. (*Id.*) Second, the note may be counted as capital even if collected after period end, but only if collected before financial statements issue. (*Id.*) Additionally, the note must be in writing from those with authority; must constitute a legally-binding obligation to fund a specified amount by a specified date; and must be executed prior to period end. (Ex. 31-002.) While OTS encourages and will seek to enforce "a general intent or a capital maintenance agreement that calls for the holding company to maintain its subsidiary institution at a particular level," the Bulletin nevertheless concludes that such agreements "alone would not constitute evidence that a note receivable existed at period-end." (*Id.*)

Notes meeting OTS's criteria are *not* treated as non-monetary contributions of capital, (*see* Ex. 39-003, at 3 n.1), and are *not* required to get OTS's prior approval. Such notes – which are neither "cash" nor "marketable securities" – are thus treated as "cash equivalents" by OTS. (*Compare* Ex. 31-001-003 *with* Ex. 29-001.) In identifying the relevant "GAAP literature, " the New Directions Bulletin

references two authorities. (Ex. 31-002.) One is a consensus view found in EITF Issue No. 85-1, which is not quoted. (*See id.*) That consensus – in contrast to the New Directions Bulletin – was that a note can be recognized as a capital contribution where there is "substantial evidence of ability and intent to pay within a reasonably short period of time," with *no* consensus regarding other, more restrictive standards like those OTS later adopted. (*See* RFJN, Ex. B, at 49.)[9]

### 3.     The Office of Inspector General's Concerns About OTS

EITF Issue No. 85-1 and the Bulletin's recognition that post-closing subsequent events (like write-downs) can and must be taken into account in at least *some* circumstances would seem to create room for confusion, justifying the Bulletin's issuance. Government audit reports confirm, for example, confusion *among OTS personnel* over the agency's handling of both post-period efforts at capital transfusions and the handling of notes. (*See* RFJN, Ex. A, at 20 ("high level [OTS] officials" authorizing or instructing institutions to backdate transactions), 28 (OTS extensive training efforts).) And in late February 2009, OTS sent the New Directions Bulletin's key terms to all thrift CEOs. (RFJN, Ex. A at 28.) The events here, however, took issue months *before* then.

---

[9] The other is a 2005 SEC pronouncement concerning "share-based payment" arrangements. (*See* Ex. 31-002; *see also* RFJN, Ex. C at 54.)

8

**B.      The Brewing Mortgage Storm's First Impacts on ASB and ASB's Efforts to Address It with OTS**

Prior to systemic problems developing in the mortgage markets, ASB was a solid institution with no regulatory problems with Mr. Dodge as CEO (or co-CEO). (RD at 3, 4, 47; Tr. 410:1-3; 415:25-416:3, 792:18-793:3.)  Additionally, ASB was not involved in the sub-prime mortgage market.  (Tr. 807:17-808:1.)

During the relevant time, Mr. Dodge owned approximately 85% of ASB's holding company.  (RD at 3.)  While not a CPA or a lawyer – both ASB and its holding company had numerous people with those backgrounds at the bank and on their boards – Mr. Dodge also sat on ASB's board.[10]  In early 2007, after ASB disclosed a decline to an "adequately capitalized" status, ASB provided OTS with a capital plan ("the 2007 Capital Plan").[11]

**1.      The Republican Party Loan Participation and Intercompany Receivable for a Charged-Off Loan**

In both discussions and in writing, ASB (and Mr. Dodge), disclosed to OTS's Scott Kramer that ASB would be bolstering its capital for the just-passed March quarter with three transactions:  (1) recognition of almost $2.5 million in **unrealized** earnings from mortgages that were funded or "in the pipeline waiting

---

[10] (*See, e.g.,* Tr. 842:16-21, 849:24-851:12 (Dodge ), 515:12-516:2 (Dearden); 604:2-18 (Kopecky); *see also* RD at 3-4 (citing additional testimony).)

[11] (*See* Ex. 11-004; *see also* RD at 7; Tr. 861:24-864:2, 865:2-23, 311:21-312:15, 423:7-19.)  *See also,* 12 C.F.R. § 565.4 (capital status classifications).

to be funded";[12] (2) a $2 million dollar participation in a loan to the Republican Party with a maturity date in June; and (3) the holding company purchasing from ASB at face-value a $400,000 charged-off loan. (*See* Ex. 11-004; *see also* Tr. 861:24-862:22.) The capital added by the last two transactions was $2.265 million. (Ex. 11-004.)

Additionally, Mr. Dodge committed ASB's holding company to infusing any needed capital. (*See, e.g.*, Ex. 17). Subsequent events confirmed that commitment, as ASB's holding company ultimately injected cash for the capital transactions at issue and approximately $17 million more. (*See e.g*, Ex. 17-001; RD at 47; FD at 5.)

For the disclosed 2007 capital infusions, OTS's Kramer raised no objections or concerns. (*See, e.g.*, Tr. 98:23-99:19 (OTS's Anderson), 226:11-24 (Lay), 809:15-810:16 (OTS's Scott), 865:2-23 (Dodge).) He also did not testify. Kramer, however, did discuss the loan participation with OTS's Gary Scott, who "wasn't really concerned" with the "pay date of being three months later than the contribution" because "having the history of the American Sterling, I didn't see a need to go back and inquire about that until in 2008." (Tr. 809:17-24.) No one at OTS, including examiners, raised any contemporaneous concerns. (Tr. 423:7-19;

---

[12] Despite this unchallenged approach, both the RD and FD erroneously focused on *realization* as an accounting requirement. (*See* RD at 25; FD at 9.)

865:2-23.)  Both the loan participation and an account receivable for the charged-off loan were then reflected on the bank's books.  (*See* Ex. 18-001-013; Ex. 36-001-002; Ex. 10-011; Tr. 688:5-18.)

## 2.    ASB Accounts for Another $750,000 in Intercompany Receivables

Using the same general approach already disclosed, another $750,000 in intercompany receivables were added to capital at year-end in 2007.  (*See, e.g.*, Tr. 41:17-42:12; Ex. 11-004.)  While there is an immaterial dispute as to whether the receivables were meant to reflect participation in an almost-completed sale of commercial property (which later fell through) or simply another specific commitment by the holding company to honor its promise to ASB, the receivables were again reflected on the bank's books.[13]  And these receivables were still there in late July 2008, when OTS objected to them. (*See* Ex. 35-002; *see also* Ex. 10-011; Ex. 18-002.)  ASB's holding company then promptly resolved all the transactions at issue, infusing $6.5 million in cash on August 13, 2008, quickly

---

[13] (*See* Tr. 451:18-21 (not put in promissory note form); Tr. 871:19-872:13 (receivables represented commitment by holding company regardless of events); Tr. 495:24-497:18 (amount due described as receivable); Ex. 17-001 (commitment to keep ASB well-capitalized).)

followed by millions more.[14]  (*See, e.g.*, Ex. 18-004-008; Ex. 35-003; Tr. 708:10-18 (Coble).)

### 3.    ASB's Holding Company's Strong Asset Position, Including Money Market Funds Held With ASB

Throughout this period, the holding company was responsible for keeping multi-million dollar balances in an ASB money market account, with balances generally in the $8 to $10 million range.  (*See* Resp. Ex. 01-001.)  Mr. Dodge testified that he believed the combination of the commitment to ASB, the size of the holding company's assets (including the funds in ASB) and the clear recording of the transactions on ASB's books justified the treatment of the transactions as "cash equivalents."[15]

### C.    ASB and Mr. Dodge First Become Aware of a Potential Issue Due to the Outstanding Amounts Owed

In May 2008, however, ASB's auditor identified a potential issue:  the transactions had still not been reconciled.  (*See, e.g.*, Tr. 688:5-18, 706:8-707:19.)  In this meeting, the auditor discussed the accounting of "subsequent events" and indicated that the transactions could still be acceptable under generally accepted

---

[14] On August 20, 2008, another $6.5 million in cash was infused and the still-existing receivables redeemed.  (*See* Ex. 18-004-008.)

[15] (*See, e.g.*, Tr. 863:17-864:14; *see also* Tr. 417:11-16, 418:16-419:8, 441:8-10, 443:23.)

12

accounting principles ("GAAP") if they were recognized post-year end in a timely fashion. (*See* Tr. 706:4-708:1 (Coble), 685:3-7 (same).)

The auditor also indicated that he had questions as to exactly when the reconciliation had to be done in order "to be admittable [sic] as of the balance sheet date" and still GAAP compliant. (Tr. 707:10-19.) Finally, the auditor offered to "take a look" at the issue but ultimately did not "circle back on that point" before the issue was resolved with OTS. (Tr. 707:17-19.) While the auditor was still presumably contemplating the issue, however, Mr. Dodge was reaching out to OTS on another front. (*See* Tr. 747:16-751:23 (Scott); *see also* Ex. 43-001.)

### D.    The Harbingers of a Systemic Meltdown Begin to Crowd Out the View

By the second quarter of 2008, ASB was increasingly concerned about its mortgage business. (*See* Tr. 746:10-751:23.) From April to June 2008, Mr. Dodge and OTS's Scott were proactively discussing their concerns about the deteriorating situation that would soon send the national economy into freefall.[16] These wide-ranging discussions included, for example, Mr. Dodge's questions whether or not OTS would allow ASB to hedge its mortgage buy-back exposure with an insurance policy. (*See* Tr. 747:16-751:23, 748:20-749:23.)

---

[16] (*See* Tr. 747:16-751:23 (OTS's Scott): *see also* Tr. 737:6-10 (dwindling strong institutions), 803:1-21 (evaporating market for mortgages), 825:6-25 (market forces over $10 million in write-downs); Ex. 43-001 (Scott research letter).)

### E.     Mr. Dodge Reaches Out to OTS on the Impending Capital Challenges Posed by the Mortgage Market Meltdown

While Mr. Dodge and Scott's discussions concerning mortgage insurance were on-going and the auditor was *still* looking at the reconciliation issue, Mr. Dodge raised in June 2008 questions with Scott about possibly contributing real property assets.  (Tr. 750:25-751:23, 818:15-820:18.)  It then took Scott at least three weeks of research before *he,* a government agent, could answer Mr. Dodge's questions.  (Tr. 776:18-778:9 (OTS concerns during examination); 819:14-820:18 (timeline) 821:17-21 (same).)

### F.     ASB Utilizes the Approach to Valuing Its Mortgage Pipeline Disclosed as Part of Its 2007 Capital Plan for Its Mountain View Relationship

While Mr. Dodge and Scott were trying to tackle the mortgage exposure problems, ASB's CFO, Ron Dearden, applied ASB's general unrealized revenue recognition principles previously shared with OTS to a new relationship (Mountain View).  (*Compare* Ex 11-004 (informing OTS re: unrealized earnings) *with* Tr. 523:8-524:1 (pipeline principles).)  Specifically, Mountain View asked ASB to contact and then service certain distressed loans.  (*See, e.g.*, Tr. 519:13-524:10, 532:14-24.)  While ASB and Mountain View were negotiating the assumed final terms, Mountain View supplied ASB with customer information and ASB began

14

soliciting.[17] (*See, e.g.*, Tr. 274:24-275:7, 310:8-12, 532:14-24, 608:18-609:4, Ex. 13-003; Ex. 14-005.)  Due to personnel shortages, only five loans closed in the first few months, but subsequently ASB contacted about 25% of the customer list, and approximately 20% of those began the refinancing process.  (Tr. 607:16-23; Ex. 22-002.)

ASB initially used a "pipeline" valuation generated by Dearden.  (*See* Tr. 523:2-15; Ex. 39-017-020; Ex. 39-039-040.)  Both Dearden and Michael Johnson testified they used ASB's same method for its other mortgage loans; methods revealed in ASB's 2007 Capital Plan sent to OTS.  (*See* Tr. 393:5-23, 405:2-406:2 (Johnson); 523:8-15, 533:8-534:11 (Dearden); Ex. 11-004 (Capital Plan).) Although a written agreement was not yet signed, Dearden valued the unrealized earnings like the rest of ASB's portfolio based on the information it already had.[18] (*See* Tr. 523:2-15, 531:7-534:11, Ex. 39-039.)  Dearden described this as aggressive but that it might be justified under GAAP due to the recent accounting changes referenced in ASB's prior OTS correspondence.  (*See* Tr. 523:2-524:10, 531:7-534:11.)

---

[17] Hildebrand erroneously assumed ASB did not have the right to contact the Mountain View customers.  (*Compare* Tr. 662:13-21 *with* Tr. 608:18-23; Ex. 22-002.)  There was also testimony about non-written forms of contracts.  (*See* Tr. 274:24-275:7; 536:3-5; 605:6-607:4.)

[18] This estimated pipeline value was approximately $706,000.  (*See* Ex. 39-020; *id.* 39-039.)

15

Dearden also testified that he told a group including Mr. Dodge that such treatment was aggressive, but that *the entire group* – which included individuals with accounting backgrounds – felt it would be proper under the new guidelines. (*See* Tr. 523:2-7; *see also* Tr. 273:23-24 (naming Executive Team).) Specifically, these changes focused on ascribing a "fair value" to assets like mortgage loans. The revised approach stemmed from several lengthy Statements of Financial Accounting Standards issued in September 2006 and February 2007. (*See, e.g.*, Ex. 11-004; *see also* Tr. 523:22-524:1, 533:11-534:11; *see also* RFJN, Ex. D at 57 & *id.*, Ex. E at 72.) As OTS recognized in issuing revised mortgage loan guidance on July 30, 2007, "[a]ccounting for mortgage banking activities is complex. The accounting literature is extensive and continues to evolve." (RFJN, Ex. G at 122; *see also id.* at 117.)

The new 212-page OTS handbook section highlights that from the time an institution takes "an application from a *prospective* borrower" it must account for a variety of issues accurately. (RFJN, Ex. G, at 118-119.) This is particularly true for applications with a "locked-in" mortgage rate, even though the applicant is free to not move forward with the loan and thus no income may be realized. (*Id.* at 124.) OTS recognized that loans could and would fall out of the pipeline and that their accounting would be part of the calculation for a bank's capital. (*Id.* at 131-134.)

16

Reflecting the evolving environment, on November 13, 2008, OTS rescinded its first effort and replaced it. (*See* RFJN, Ex. H, at 152.) The revision took into account a November 2007 SEC Staff Accounting Bulletin indicating that "the expected net future cash flows related to the associated servicing of the loan should be *included* in the measurement of all written loan commitments that are accounted for at fair value through earnings;" a position at odds with OTS's prior bulletin. (*Id.* at 143 (emphasis added).)

G. **OTS Takes Issue With the First Three Capital Transactions**

In late June 2008, OTS began examining ASB. (*See* Ex. 10-002.) On July 24, 2008, OTS identified the intercompany receivables and the loan participation as capital transactions that it wanted reversed. (Ex. 35-001-002; Ex. 45-002.) This was done on August 4, 2008, although the receivables remained on the books. (*See* Ex. 35-003; Ex. 18-004-008.) ASB's holding company then infused $6.5 million in cash on August 13, 2008, as well as infusing other cash capital amounting to a total of just over $20 million during the August/September period. (Ex. 14-003, 18-004-005; Resp. Ex. 1-001; Tr. 208:20-24, 783:14-15; FD at 5, RD at 47.) The receivables were redeemed in August. (*See* Ex. 18-004-008.)

H. **Mr. Dodge Causes ASB's Holding Company to Inject More than the Statutory Maximum**

Of the holding company's capital deposits, approximately $7.5 million came from money market accounts held at ASB. (*See* Ex. 14-003; Tr. 80:3-22 (OTS's

17

Anderson), 535:14-23 (Dearden).)  Not counting the injection for the reversed transactions, ASB's holding company injected several million dollars more than the statutory maximum that OTS could require.[19]

That winter, ASB's board concluded that the Mountain View pipeline accounting fell short of the way other mortgages were handled.  (*See* Ex. 50-01; Tr. 349:9-24, 332:2-22.)  Specifically, customer applications had not yet been filed and rates not yet locked when the projection was generated.  (*See* Tr. 530:12-17; Ex. 41-001.)  Either event, however, would have more clearly allowed for recognition of such still-contingent revenues.  (*See, e.g.*, RFJN, Ex. G at 118-119, 124-125 (discussing role of both applications and locked rates); *see also id.* at 127-128 (discussing SFAS 157).)

The ASB board also relied on the lack of a signed Mountain View agreement, although work was being performed, customers expressed interest, and some mortgages had closed.  (Ex. 22-002; Tr. 535:24-536:5, 607:16-609:4; *see*

---

[19] 12 U.S.C. § 1831o(e)(2)(E)(i) limits "the aggregate liability" of all companies with control over the institution under a guarantee to the "lesser of" either "5 percent of the institution's total assets at the time the institution became undercapitalized" or the amount "necessary to bring the institution into compliance with all capital standards applicable … as of the time the institution fails to comply" with a capital plan.  As the bank's assets were somewhere between $229 million to $280 million, this limit ranged from a low of approximately $11.5 million to, at most, approximately $14 million.  (*Compare* Ex. 2-004 *with* Ex. 5-004; Tr. 742:6-10 (Scott estimate).)

*also* Ex. 14-005.)  OTS was notified and the accounting treatment reversed.  (Ex. 50-001; Ex. 18-010.)

At that point, ASB's holding company had already injected at least $3 million, if not $8.5 million more, than it could be legally required to inject.  *See* supra at 17.   Moreover, the primary downward driver on ASB's capital during this period was the melt-down in the value of ASB's loan portfolio due to the nationwide economic storm.  (*See, e.g.*, Tr. 803:1-21, 825:6-25 (OTS's Scott); Ex. 10-011 & 10-026.)  Specifically, due to a freeze in mortgage purchases and other market-related changes, OTS required ASB to write-down its mortgage assets by tens of millions of dollars.  (*See, e.g.*, Tr. 825:6-25 (write-downs for just Aug. and Sept.); *see also,* Ex. 7-020.)  Eventually, despite an agreement to purchase ASB being on the verge of closing, the FDIC placed the bank in receivership.  (Tr. 893:5-16.)

## I.     The Hearing Testimony Elicited From OTS's Witnesses

OTS's witnesses also presented the following evidence:

### 1.     The Testimony of Those Involved With ASB and the Implementation of the Four Transactions

OTS called fourteen witnesses.  But only four had personal involvement in the challenged transactions:  Michael Thompson, Ron Dearden, Michael Johnson and Mr. Dodge.  They testified that Mr. Dodge did not himself create the 2007 Capital Plan; did not make any of the accounting entries; and did not generate the

19

Mountain View pipeline value.[20]  (*See* Tr. 232:17-240:20 (journal entries), 242:9-243:3 (Dodge non-involvement), 283:20-22 (Capital Plan authors), 523:2-4 (Ex. 11-001 (Capital Plan)); Ex. 41-001 (Mountain View); Ex. 39-039-040 (same).)

With respect to the $2 million loan participation and the inter-company receivables, all four testified that they thought the transactions were proper and that ASB's holding company stood behind all of the transactions regardless of what might happen.[21]  Witnesses also consistently testified that Mr. Dodge always acted as if he believed the transactions were proper.[22]  Witnesses further testified to telling OTS personnel about the loan participation and their understanding that there were no issues.  (*See, e.g.,* Tr. 228:24-229:11 (Lay); 280:17-283:13, 311:21-312:3 (Thompson); Tr. 865:2-23, 867:12-21 (Dodge).)  And OTS's Regional Deputy Director confirmed that he knew the loan participation would not be realized for a number of months, but saw nothing wrong with it.  (Tr. 728:24-25, 809:17-24.)  Additionally, multiple board members were informed about the loan

---

[20] Both the RD and FD found Mr. Dodge's involvement in group activities sufficient to create at least some responsibility.  *(See* FD at 16-17 n.8, RD at 28.) This finding is not challenged, but the group nature remains relevant, particularly to Mr. Dodge's state of mind.

[21] (*See* Tr. 287:21-288:11, 283:10-19, 291:9-293:20 (Thompson); Tr. 387:2-388:3, 390:21-391:24, 393:5-394:14 (Johnson); Tr. 526:17-22, 515:24-517:21 (Dearden); Tr. 859:19-864:2, 867:12-868:5, 871:19-872:13, 878:19-879:6 (Dodge).)

[22] (*See, e.g.,* Tr. 356:9-16 (Yelorda); Tr. 603:13-604:18 (Kopecky); Tr. 706:4-707:19 (Coble); *see also* Tr. 801:4-802:25 (OTS's Scott).)

participation and understood it was a commitment for an amount not due for several months. (*See, e.g.*, Tr. 162:10-22 (Kimak); Tr. 322:8-21 (Yelorda).)  And the obligations **were** honored by ASB's holding company.[23] *See supra* at 17-18.

Regarding Mountain View, the testimony was consistent that Mr. Dearden utilized the same general method that ASB used for its other mortgages; a method unchallenged for the 2007 Capital Plan. (*See, e.g.*, Tr. 523:8-15 (Dearden); Tr. 291:25-292:2 (Thompson).)  Again, while Dearden discussed with the team that it might be aggressive, all (including Dearden) were comfortable with the treatment in light of their prior experiences. (Tr. 523:2-524:1, 510:11-513:4.)  Using that methodology, the initial value would be adjusted over time. (*See, e.g.*, Tr. 524:11-19.)  Part of the reason for comfort was that, as of April 30, 2008, loan information was received and being worked; ultimately, several loans closed and leads were still being worked as late as December 2008.[24]

---

[23] OTS sought to impeach Mr. Dodge by asking why the accounts were not reconciled sooner. (*See* Tr. 428:14-15, 441:11-14, 451:3-21.)  Beyond Mr. Dodge's general belief that the combination of money held at ASB and the holding company's commitment to ASB  was sufficient, he also testified about cash flow. (*See, e.g.*, Tr. 441:10-25; *see also* Tr. 871:19-872:13.)  Due to the large money market balances of ASB, this can only reference the limited interest obtained from ASB.  (*See* Resp. Ex. 1-001.)  Either way, the FD "assumed that the deposits . . . were indeed available…." (FD at 15 n.7.)

[24] (*See* Tr. 293:1-294:11 (impact of changes in mortgage industry), 524:11-524:22 (Dodge frustration at progress), 877:14-881:1 (same); Ex. 14-005 (staffing issues); Ex. 22-002 (describing efforts and results).)

21

The Mountain View accounting was reversed internally after its handling was raised with the Audit Committee and sent to an outside auditor, who provided an opinion almost two months after questions were initially raised.[25] It was the lack of updating (i.e. fluctuation) that ultimately triggered Michael Johnson's concerns and Mr. Dodge was one of those pursuing the unresponsive individual. (*See* Tr. 381:1-20, 382:17-383:11, 393:24-395:6 (Johnson); Tr. 524:11-525:20 (Dearden). Thus, when the Board asked whether there was a contract or not in later meetings, Mr. Dodge honestly responded that it was a source of confusion, that the answer was still not known. (*See, e.g.*, Tr. 183:20-184:7 (Kimak); Ex. 16-001.) Ultimately, the Board ordered the transaction reversed and notified OTS. (*See* Ex. 50-001.)

## 2.    The May 2008 Audit

ASB's auditor testified to raising some concerns about the first three capital transactions in May, but also to telling Mr. Dodge and others that the transactions might *still* be GAAP compliant if reconciled and treated as "subsequent events."[26]

---

[25] (*See* Ex. 14-005 (initial board questions in October); Ex. 39-013-016 (auditor Jan. 9 analysis); Ex. 50-001 (board Jan. 9 letter to OTS); *see also* Tr. 332:2-22, 349:9-24, 589:13-24.)

[26] This was consistent with Mr. Dodge's expert, Leonard Lyons. (*Compare* Tr. 706:4-707:19 (Coble, auditor), 946:4-9, 964:11-24 (Lyons) *with* RFJN, Ex. B.)

(*See, e.g.*, Tr. 696:10-697:17; 706:4-708:1.)[27]  The auditor was asked if that would still be possible, then testified that he promised to find out, but ultimately did not provide any answer.  (*See* Tr. 707:10-19.)  This was in part because the capital portions of the transactions were reversed and the obligations satisfied in August. (*See* Tr. 708:2-18.)

During the few weeks between the auditor's promise and OTS examiners challenging the three transactions, the undisputed testimony was that Mr. Dodge was actively working with OTS personnel to try and find innovative ways to protect ASB and inject far more capital into the bank.   (Tr. 746:10-751:23 (Scott).) Ultimately that was done with $20 million in cash.  *See supra* at 17-18.

### 3.      The Testimony of OTS's Personnel and John Kopecky

OTS also presented testimony from the 2008 examiners (Scott Anderson and Kimberly Einspahr), who expressed their concern over the bank's overall health. (*See generally* Tr. 27:14-32:21 (Anderson); Tr. 135:3-136:10, 151:10-152:21 (Einspahr).)  The examiners testified not just about the three capital transactions, but also about the deteriorating picture due to the mortgage meltdown.  (*See, e.g.*, Tr. 110:10-112:25 (Anderson); Tr. 151:10-151:21 (Einspahr); *see also* Tr. 803:1-21, 825:3-5.)

---

[27] (*See also* Tr. 685:3-7 (recognizing "latitude" in accounting guidance); 687:6-10 (ASB team accepts auditor's concerns), 688:5-18 (issues identified by non-hidden entries on ASB books); 689:7-14 (further acceptance by ASB team).)

23

OTS's Gary Scott testified that he knew of the loan participation and the use of purchase from the charged-off loan to increase capital in 2007. (Tr. 809:15-810:16.) He testified how he had not been concerned about either the timing of the infusion or the fact that the participation would not come due until several months later. (Tr. 809:17-22.) Instead, he testified that it was the $750,000 in other capital transactions using the previously disclosed template that gave him "the largest pause," as well as the fact that – as revealed in ASB's books – the previous items had not yet been reconciled.[28] Scott also testified to Mr. Dodge's sincere surprise at learning of OTS's objections and Mr. Dodge's strong efforts to save the institution, including his willingness (without argument) to reverse the transactions and infuse cash into ASB.[29]

Scott testified that he thought the three capital transactions were unsafe and unsound, (Tr. 788:4-17), but he also did not specifically identify any of them as false and misleading.[30] Scott further testified it took him three weeks to answer

---

[28] (*See* Tr. 795:25-796:3 (identifying two transactions re: "pause"), 827:12-21 (Capital Plan); *see also* Tr. 580:7-9 (Kopecky) (receivable on books).)

[29] (Tr. 801:14-18 (surprised), 802:16-25 (busy time for everyone), 822:2-12 (quick reversal and infusion of cash), 825:3-5 (cash infusion).)

[30] Scott claimed the transactions rendered ASB's TFR's "false and misleading," but he appeared to use a different standard for his sworn declaration claiming Mr. Dodge first raised non-cash capital with OTS on June 23, 2008, despite his awareness in **2007** of the $2 million non-cash transaction. (*Compare* Br. in Supp. of OTS's Mot. for Summ. Disposition, Ex. 26, ¶ 8 *with* Tr. 810:8-16, 812:18-21.

24

Mr. Dodge's question regarding real property contributions to capital assets. (Tr. 820:5-18; Ex. 43-001.) OTS's Patricia Hildebrand similarly did not claim that the first three capital transactions were false. She was careful to testify only that, as recorded in the books, they were misleading, while using the *later* New Directions regulatory approach to criticize transactions like the loan participation disclosed to Gary Scott. (Tr. 658:24-660:4.) Hildebrand also made no effort to evaluate any of the transactions under the GAAP standards described by ASB's auditor, Mr. Dodge's expert (Leonard Lyons), or EITF Issue 85-1.[31]

Similarly, OTS sought opinion testimony from John Kopecky, who had been hired by ASB at the agency's strong suggestion *after* the three capital transactions were reversed and at least $13 million injected into the bank.[32] While Kopecky was critical on all fronts, (*see, e.g.*, Tr. 586:8-10, 599:18-23), he also characterized as improper various transactions and mortgage-related bookings of earnings without comparing his opinions against OTS's own materials and positions or ASB's prior disclosures.[33]

---

[31] (*Compare* Tr. 658:24-660:4, 640:1-8 (Hildebrand) *with* Tr. 706:4-707:19 (auditor), 944:16-946:14 (Lyons), and RFJN, Ex. B at 49-50.)

[32] (*See* Tr. 335:21-336:2 (OTS recommendation); Tr. 565:20-22 (start with ASB at end of Aug. 2008); Tr. 602:3-8 (started after exam); 822:9-12 (infusion).)

[33] For example, Kopecky stated that *any* note transaction would violate OTS and GAAP unless pre-approved, but that is incorrect. (*Compare, e.g.*, Tr. 572:18-573:21 *with* Ex. 31-001-003 & RFJN, Ex. B at 49-50 (approving various note transactions without requiring pre-approval).) Kopecky also testified that he had

### 4.     Information Shared with the Board and Disagreements Over the Mountain View Transaction

Some board members testified they could not recall being informed that, for example, the underlying loan tied to the loan participation had been extended. (*See, e.g.*, Tr. 322:25-323:21 (Yelorda).)  The board members acknowledged, however, that the holding company ultimately met its funding commitments.  (*See, e.g.*, Tr. 208:20-209:4, 210:22-211:16 (Kimak); Tr. 352:16-25 (Yelorda).)  There was also testimony that Mr. Dodge maintained as late as December that the handling of the Mountain View transaction was proper since it was how all the other mortgage accounts were handled;[34] accounts all consistent with Mr. Dodge's own testimony about what he believed.  (*See, e.g.*, Tr. 850:25-851:6, 862:17-864:14, 879:7-21.)

### 5.     Brokered Deposits and Liquidity

The Final Decision found no liquidity crisis ever occurred, whether or not associated with any brokered deposits.  (*See* FD at 8, 15; RD at 19-20.)  In fact, the testimony was clear that none of the challenged transactions were undertaken to

---

never seen the New Directions Bulletin.  (Tr. 612:16-25.)  Similarly, he rejected use of mortgage income projections until refinancing "actually happened," which conflicts with OTS's own positions.  (*Compare* Tr. 594:22-595:8, 608:2-7 *with* RFJN, Ex. G, at 118-119 (discussing pipelines and "fall out" risk), 327 (using market participant assumptions)), 329-330 (loan commitments), 354 (discussing reporting unrealized gains and losses) & RFJN, Ex. H, at 143, 146 (discussing net *expected* cash flows); *see also* Ex. 11-004, Ex. 22-002.)

[34] (*See* Tr. 184:19-185:1, 210:22-211:1 (Kimak); Tr. 332:23-333:10, 346:25-347:5, 356:9-16 (Yelorda).)

attract brokered deposits.  (*See* Tr. 540:3-7 (Dearden); Tr. 868:15-869:8 (Dodge).)
While OTS personnel could not testify as to exactly why ASB accepted such
deposits in mid-2008,[35] Mr. Dodge testified how the cost of the funds became
lower than for standard deposits, which was enough to temporarily entice ASB to
change its historical practices.  (Tr. 869:2-8.)

While OTS personnel testified that some personnel were concerned about a
*possible* liquidity crisis,[36] they could not point to any facts demonstrating such
exposure nor could they provide any timelines for withdrawal of the approximately
$19 million in brokered deposits, nor relate such withdrawals to the more than $20
million infused into ASB on August 13, August 20 and in September.[37]  What
OTS's witnesses could testify to were unrelated background factors affecting
liquidity that dwarfed the amounts at issue.  These factors included ASB's inability
to sell forward mortgages worth tens of millions of dollars; Countrywide's

---

[35] (*See* Tr. 123:8-25 (Anderson did not know what brokered deposit rates
were), 124:1-11 (Anderson speculating as to reason, but acknowledging not a party
to any communications re: brokered deposits). )

[36] (*See* RD at 19, Tr. 779:10-20, Ex. 10-024.)

[37] (*See* Tr. 122:17-22 (institution had sufficient liquidity to "run off"
brokered deposits); Tr. 777:19-786:8 (Scott unsure of timelines), 803:11-21
(liquidity issues due to trouble selling pipeline).

insolvency; a massive increase in ASB's recourse exposure; and the required OTS writedowns of assets.[38]

Despite daunting circumstances, Lawrence Dodge kept putting more and more millions into ASB; money in which he had an 85% stake and in amounts far above the holding company's legal maximum. (*See* FD at 5, 12; RD at 3, 11, 47 (citing testimony).) Thus, the hearing effectively ended where it began, with Mr. Dodge honoring the April 2007 capital commitments after infusing tens of millions of dollars into ASB. (*See, e.g.*, OTS Ex. 17-001 ; Tr. 825:3-4.)

## VI.   SUMMARY OF ARGUMENT

ASB's holding company had – at all times – enough resources to correct the challenged capital transactions. Mr. Dodge personally caused the holding company to do so when OTS raised concerns. *See* infra at 33-34; *see also* supra at 17-18. Mr. Dodge was also responsible for injecting in excess of $17 million *more,* well above any legal requirements. *See* infra at 33; *see also* supra at 17. But the Final Decision fails to grasp how that last fact *alone* should defeat OTS's enforcement effort because it makes clear his intentions, his state of knowledge, his culpability, the level of the holding company's commitment, and the relative risks due to any accounting mistakes. *See  infra* at 33-36, 43-46. OTS's efforts to

---

[38] (*See* Tr. 803:1-21 (Scott, describing issues as "the whole reason of our concern regarding capital adequacy"), 823:24-826:8 (describing situation in detail); Ex. 10-024-025 (same).)

*punish* Mr. Dodge for correcting harmless (i.e. no loss) mistakes while he was simultaneously doing *more* than the law required is at cross-purposes with any rational regulatory regime.

OTS's misguided approach is reflected in both the Final Decision and the Recommended Decision. (*See, e.g.*, FD at 15-16, RD at 44, 47.) They contain three central errors: the lack of substantial evidence to support *any* finding of likely harm, or culpable *scienter*, or personal gain. *See* infra at 32-55; *see also* supra at 9-12, 14-23. These errors are amplified by other legal errors and additional simple errors of fact, including the way both decisions improperly use hindsight and a "should have known" standard to avoid grappling with the record of events as they actually unfolded. *See* infra at 40, 47-49, 53-54. These errors invalidate the Final Decision.

Ultimately, neither the Final Decision nor OTS ever acknowledges the commitment to ASB displayed by Mr. Dodge or the impact that *must* have on these proceedings. Treating one who goes so far and above the law's funding requirements as if he were on a par with the gallery of check-kiters, embezzlers, and riverboat gamblers that populate the pages of most enforcement cases is arbitrary and capricious. Doing so after failing to take into account the practical difficulties and lack of regulatory clarity faced by Mr. Dodge in 2007 is similarly arbitrary and capricious. Moreover, holding Mr. Dodge to a standard of

knowledge and research that swathes of OTS's *own enforcement staff* did not meet, is the kind of arbitrary treatment that the APA was designed to prevent.

OTS's effort is particularly inappropriate where OTS personnel's explicit acquiescence in the largest of the very transactions it now seeks to punish is arguably as much a "cause" as is Mr. Dodge. While, looking back, Mr. Dodge has acknowledged areas for improvement, his efforts injecting more than $20 million into the bank that he carefully tended to for more than three decades conclusively establishes where his heart always lay. The petition should be granted and the case dismissed in its entirety.

## VII.   STANDING

The Final Decision imposes a prohibition order and a $1 million penalty against Mr. Dodge. (FD at 19.) If the Petition is granted and the Final Decision vacated, Mr. Dodge's injury-in-fact will be redressed. Accordingly, standing is proper under both 12 U.S.C. § 1818(h) and Article III of the United States Constitution, as well as under any prudential doctrines. *See, e.g., Affum v. United States*, 566 F.3d 1150, 1158-1159 (D.C. Cir. 2009).

## VIII.  STANDARD OF REVIEW

Review of the Final Decision is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(E). *Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C. Cir. 2000) (citing 12 U.S.C. § 1818(h)). Accordingly, factual findings must be supported by substantial evidence on the record as a whole. *See id.* "It is well

established that the substantial evidence rule requires consideration of the evidence on both sides; evidence that is substantial viewed in isolation may become insubstantial when contradictory evidence is taken into account." *Landry v. FDIC*, 204 F.3d 1125, 1140 (D.C. Cir. 2000); *see also Siegel v. SEC*, 592 F.3d 147, 155 (D.C. Cir. 2010). Thus, an agency's decision "must be 'in accordance with' the weight of evidence, not simply supported by enough evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict ....'" *Steadman v. SEC*, 450 U.S. 91, 99 (1981). Moreover, "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 230 (1938).

Similarly, non-factual conclusions must be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Proffitt*, 200 F.3d at 860. This Court has repeatedly refused to apply *Chevron* deference to legal interpretations where a statute is administered by more than one agency or it is otherwise inappropriate. *See, e.g., id.* at 860; *DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 487-488 (D.C. Cir. 2013) (rejecting agency claim of *Chevron* deference); *Wachtel v. OTS*, 982 F.2d 581, 585 (D.C. Cir. 1993) (same).[39] Additionally, a decision is

---

[39] *See also Bank of New York v. FDIC*, 453 F. Supp. 2d 82, 94-95 n.7 (D.D.C. 2006) (refusing to give *Chevron* deference to FDIC interpretation of FIRREA, looking to persuasiveness instead).

arbitrary and capricious if it relies "on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011).

## IX.   NEITHER THE LAW NOR SUBSTANTIAL EVIDENCE SUPPORTS THE PROHIBITION RULING

To impose a prohibition order, OTS must establish that Mr. Dodge engaged in an improper act under § 1818(e)(1)(A); that such act had an impermissible effect under § 1818(e)(1)(B); and that the act was accompanied by a culpable state of mind under § 1818(e)(1)(C). *See Michael v. FDIC*, 687 F.3d 337, 349 (D.C. Cir. 2012); *see also Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir. 1994).  Here, a combination of legal errors and failure to abide by the substantial evidence standard led the Final Decision into grave error on each front.

### A.   The Final Decision Cannot Be Reconciled with 12 U.S.C. § 1818(e)(1)(B)'s Effect Test or the Evidence as a Whole

Section 1818 requires that "**by reason** of the violation, practice or breach" identified, one of three effects occurs:

- the institution either "has suffered or will **probably** suffer financial loss or other damage";

- the institution's depositors "have been or **could** be prejudiced"; or

32

- the party "has received financial gain or other benefit by reason of such violation, practice, or breach."

12 U.S.C. § 1818(e)(1)(B)(i)-(iii)(emphasis added). Here, the Final Decision arbitrarily and capriciously found all three elements were met. (*See* FD at 6-16, 19; RD at 21-43.)

### 1.    Both the Bank and Depositor Harm Provisions Require That Harm Be Likely, Not Just Theoretically Possible

In 1989 Congress passed the Financial Institutions Reform, Recovery, & Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183.  Prior to FIRREA, regulators had to prove that "the bank has suffered or will probably suffer *substantial* financial loss or other damage or that the interests of its depositors could be *seriously* prejudiced." *See Proffitt v. FDIC*, supra, 200 F.3d at 864 (emphasis added).  In addressing the changed language, the legislative history contains repeated references to the bill's effect, as it "unified the removal provision" and required that "the institution must have suffered or **be likely to suffer** financial loss or prejudice to its' depositors' interests." (RFJN, Ex. I at 155 (emphasis added); *see also* RFJN, Ex. J, at 118.)

Here, both decisions utilize a much lower, inappropriate standard that allows for purely hypothetical harms divorced from a case's actual facts. (*See* FD at 15; RD at 37-39.)  For example, the Final Decision does not take into account a central, undisputed fact:  ASB's holding company injected millions more than

33

needed to cover any of these transactions within days of OTS raising concerns. (*See* FD at 15.)   ASB also quickly put more into the bank than the entire amount of brokered deposits it held. (*Compare* FD 5 *with id.* at 7.)  Further, holding the deposits was a rare decision made <u>not</u> because anyone at ASB was seeking to manipulate capital levels to attract brokered deposits, (*see* RD at 28), but rather due to a unique set of circumstances.  (*See* Tr. 869:2-8.)

OTS did not present admissible evidence of an actual liquidity crisis and certainly not the kind of detailed analysis required to show a liquidity problem.[40] The quick $20 million cash infusion belies any possible concern about any *theoretical* liquidity threat.  (*See* FD at 5, 16.)  No evidence begins to approach the statutory "likely" standard when so much money stood behind (and was placed in) the institution.  Nor was any alleged liquidity crisis from brokered transactions reasonably foreseeable when the challenged capital transactions were first booked in April 2007, particularly given the findings that the transactions were ***not*** undertaken for the purposes of attracting brokered deposits.  *See Kaplan*, supra,

_____

[40] (*Compare United Western Bank v. OCC*, -- F. Supp. 2d --, 2013 WL 796021 (D.D.C. Mar. 5, 2013) ("…the OTS field staff provided a detailed analysis of the Bank's liquidity situation," providing specific details) *with* Tr. 123:8-124:11 (no actual knowledge); Ex. 10-023 (broad, unsupported factual assertions).)  *See also* supra at 26-27 n.36-39; *Loumiet v. OCC*, 650 F.3d 796, 800 (D.C. Cir. 2011) ("But the Agency's evidence here -- a conditional statement from an Agency examiner that some unspecified harm may result – falls short of the necessary quantum of proof.")

104 F.3d at 421 ("Any such risk must of course be reasonably foreseeable"). (*See also* RD at 19).

The decisions, grounded in hindsight, beg the question of what the result would be if ASB's holding company had resolved the outstanding amounts more promptly (e.g., before June 2007).[41] OTS's theory would support an order based on the subsequent brokered deposits even *if* the disclosed loan participation was redeemed in June, as disclosed. But such remote situations or indirect risks (if any) could not have been caused, as the statue requires, "by reason" of the **party's** wrong-doing any more than Mr. Scott's actions, or that of others at OTS who were at least as confused as Mr. Dodge about this allegedly "clear" or "plain" standard despite their "expertise." *See* 12 U.S.C. § 1818(e)(1)(B).

By erroneously adopting OTS's accounting theory (that the transactions were improper at moment of booking), neither decision focused on the proper questions: (1) was there an "ability and intent to pay"? (2) what constitutes a "reasonably short period of time" in light of OTS's acquiescence to a three month delay?; and (3) given the crashing economy and actual payment of $20 million, was any delay inadvertent or mistaken?[42] Both decisions fail to take into proper

---

[41] (*See* FD at 9 (acknowledging June 2007 due date), 13 (not reconciling OTS's Kramer's actions with standards).)

[42] (*See* RFJN, Ex. B (EITF No. 85-1); Tr. 639:19-20 (relying on EITF "85-11"), 670:8-11 (claiming "New Directions" were already "well established"); Tr.

account the holding company's actual support for ASB, OTS's actions and regulatory confusion, or a devastating environment where the ten bank failures between January 2003 and December 2007 have exploded almost fifty-fold.[43]

The capital treatment was immediately fixed, demonstrating no enhanced risk to either the bank or depositors. (*See, e.g.*, FD at 5.) As to effect, the Final Decision thus accords with neither the law nor the facts, but rather "has made [Mr. Dodge] something of a scapegoat." *Kaplan v. OTS*, 104 F.3d 417, 424 (D.C. Cir. 1997).

### 2. The Financial Gain Finding Also Violates the APA

The Final Decision also violates the APA in finding that Mr. Dodge acquired "financial gain or other benefit" under 12 U.S.C. § 1818(e)(1)(B)(iii). (*See* FD at 15; RD at 39-40.) OTS has a history of unsuccessfully arguing that parties must be forced to pay millions when they did not inject as much into a bank as OTS believes they should. *See, e.g.*, *Wachtel v. OTS*, 982 F.2d 581, 583 (D.C. Cir. 1993). This case, however, presents the polar opposite: OTS has argued that Mr. Dodge has *personally gained* after **he caused ASB's holding company to put into ASB not just the $3.015 million for the reversed transactions, but over $17**

---

802:16-803:21, 825:3-25 (Scott concerning "busy" time and mounting problems in mortgages, leading to infusion).)

[43] (*See* FD at 3, 5 (resolution and support), 13 (disclosures to OTS); Ex. 31-001-003 ("New Directions"); RFJN, Ex. A at 19-22 (inspector general report re: OTS confusion); RFJN, Exs. K-M (bank failure statistics).)

**million more, then watched as all ASB's stock became worthless, while himself owning 85% of ASB's holding company.** (*See* FD at 5, 15; *see also* RD at 12, 39-40, 47.)

Instead of claiming that the delay caused by the mistaken accounting was used to fund speculative investments or to personally feather Mr. Dodge's financial nest, OTS's theory is that it was wrong for some of the very funds used to shore up ASB to sit **at ASB** earning miniscule interest in ASB's money market accounts. (*See, e.g.*, RD at 40 (holding company controlled $6.8 million deposited at ASB "where it was earning interest").) The Final Decision's theory that any arguable delay in collection – without more – constitutes "financial gain or other such benefit" violates the APA. (*See* FD at 15.)

*Wachtel* illustrates these flaws. There, this Court rejected OTS's attempt to force the petitioners to pay $5.3 million using a cease-and-desist order without meeting the requirements of showing, among other things, unjust enrichment under 12 U.S.C. § 1818(b)(6)(A). *See* 982 F.2d at 583. The same result occurred in *Rapaport v. OTS*, 59 F.3d 212, 220 (D.C. Cir.), where this Court held that Rapaport's "alleged failure to contribute as agreed in order to maintain Great Life's required level of capital does not amount to such unjust enrichment."

Here, the same is true. OTS does not contend that there was *ever* any breach of a maintenance agreement. Instead, Mr. Dodge caused ASB's holding company

37

to go above and beyond the statutory limits, including timely replacing the three challenged transactions, just as OTS demanded.[44] *See* supra at 17.   As in *Rapoport*, it is impossible to find personal gain on a record so full of Mr. Dodge's personal loss.  Moreover, amounts sufficient to redeem the transactions remained with ASB the entire time, presumably put **by ASB** to uses believed to be offering a better return.  (*See* Resp. Ex. 1-001; *see also* Tr. 281:13-19.)  That is not personal or financial gain.  The gain findings thus cannot be sustained.

OTS, however, has sought to justify their incorrect argument by citing *De La Fuente v. FDIC*, 332 F.3d 1208, 1224-1225 (9th Cir. 2003).  (*See, e.g.*, RD at 39-40.)  This, however, provides no support for transforming loss into gain.  While it contains language about nondisclosures leading to being "*relieved* of [an] obligation to infuse capital into the bank to counterbalance FIB's overleveraged status," *id.* at 1225 (emphasis added), the use of the word "relieved" is telling.  "As a result of [his] omissions and misrepresentations, the FDIC investigators classified the loan as 'special mention' instead of 'substandard,' **saving FIB's board members (including De La Fuente) from having to make substantial capital injections** into the bank." *Id.* at 1224 (emphasis added).  Unlike here, in *De La*

---

[44] The Mountain View transactions also did not materially benefit either Mr. Dodge or ASB's holding company.  Within days of filing the applicable TFR , the holding company had already contributed $6.5 million.  (*Compare* Tr. 589:13-24 (reported for second quarter); Ex. 7-002 (July 31, 2008 filing date) *with* supra at 17-18.)

*Fuente* the court described **never** injecting *any* capital, while De La Fuente was also busy using the bank to make large, self-dealing loans to entities under his control. *See id.* at 1221. The case thus has no bearing in light of the $20 million injection while Mr. Dodge received no benefits, financial or otherwise. *See* supra at 17-19. The Petition should thus be granted, especially since there was also no statutory culpability.

**B.      The Final Decision Cannot Be Reconciled with 12 U.S.C. §
         1818(e)(1)(C)'s Culpability Test or the Evidence as a Whole**

Section 1818(e)(1)'s culpability prong requires either a showing of "personal dishonesty" or "willful or continuing disregard for the safety or soundness" of the institution. 12 U.S.C. § 1818(e)(1)(C)(i-ii). Both tests require showing *scienter*. *See Michael*, supra, 687 F.3d at 351. Under arguably the most lenient standard – continuing disregard – an agency must show at least "heedless indifference to the prospective consequences." *Grubb v. FDIC*, 34 F.3d 956, 961 (10th Cir. 1994). "Willful disregard" requires even more, such as a mental state akin to recklessness. *See Brickner v. FDIC*, 747 F.2d 1198, 1203 n.6 (8th Cir. 1984). And "personal dishonesty" is of the same magnitude, requiring "a disposition to lie, cheat, defraud, misrepresent, or deceive." *See Michael*, 687 F.3d at 351 (quoting the

standard); *Doolittle v. Nat'l Credit Union Admin.*, 992 F.2d 1531, 1539 (11th Cir. 1993).[45]

Under both subsections "OTS must show a degree of culpability *well beyond* mere negligence, i.e. there must be a showing of *scienter*." *Kim v. OTS*, 40 F.3d 1050, 1054-1055 (9th Cir. 1994) (emphasis added); *see also* RD at 40, 44. Here, the Final Decision improperly substituted a negligent "should have known" standard. (*See, e.g.*, FD at 11-13; RD at 30, 34, 44.)[46] But there is no substantial evidence for any such finding, particularly when, as this Court explained in *Kaplan, supra*, the evidence is viewed from the required *ex ante* perspective rather than an *ex post* one. *See* 104 F.3d at 422. The cascading errors begin with the unsupportable finding that the standards for handling either the first three transactions or the Mountain View transaction were somehow plain or clear. *See* FD at 13 ("Plainly…"); RD at 30 ("…clearly…").)

## 1. The Proper Handling of Period-End Capital Infusions Like the First Three Capital Transactions Was Not Clear

For the first three transactions, the initial points of legal error concern the state of GAAP and OTS's regulatory guidance as it existed in April 2007 and early 2008. The Final Decision builds off of a single foundation:  OTS's Examination

---

[45] *See also Skirlick v. Fidelity & Deposit Co. of Maryland*, 852 F.2d 1376, 1378-1379 (D.C. Cir. 1988).

[46] The RD went much further, actually invoking and using at one point a strict liability standard.  (*See* RD at 30) (citing cases).)

40

Handbook language requiring no pre-approval for capital consisting of "cash," "cash equivalents," and "other high quality, marketable securities." (*See* RD at 30; FD at 13 (both citing Ex. 29).) The only testimony, however, asserting that there was anything clear about the term "cash equivalents" or the proper handling of post-period adjustments to capital involving notes came from Patricia Hildebrand.[47] (*See* Tr. 640:9-22 (discussing handbook); *see also* Tr. 635:23-637:5 (applying New Directions Bulletin to pre-Bulletin transactions), 670:5-11.)

Notably, however, Hildebrand's testimony that this treatment was "well established" was contradicted by the actions of Mr. Kramer in 2007, who stood by as ASB openly informed him that it would be breaking Hildebrand's "well established" rule. (*Compare* Tr. 670:5-11 (Hildebrand) *with* 861:24-862:22, 865:2-23 (Dodge); Ex. 11-004.) Her legal conclusion was also contradicted by Scott's testimony that he was aware of the $2 million loan participation **and** its maturity after period end, yet saw no cause for concern. (Tr. 809:15-810:16.) And it was contradicted by the 2007 examiners, who were also aware of the transactions yet raised no concerns. (Tr. 226:11-24 (Lay).)

---

[47] John Kopecky sought to provide similar testimony, (*see, e.g.* Tr. 572:8-573:22, 583:5-9, 600:15-21, 612:7-25, 661:10-662:12), but his testimony conflicts with the New Directions Bulletin. (*See* Ex. 31-001.) *See also supra* at 25-26 n.33. Additionally, Kopecky did not purport to apply EITF Issue No. 85-1. (RFJN, Ex. B at 49-50.)

This testimony is also contradicted, not just by ASB's then-management team,[48] but also by ASB's auditor who thought that even after year-end, the bank might still be able to come into GAAP compliance. (Tr. 696:10-697:17, 706:4-708:1.) Moreover, Hildebrand's testimony is flatly contradicted the title of the "New Directions Bulletin."[49] (*See* Ex. 31-001; *see also* RFJN, Ex. A at 19-47 (OIG report on issue).) Her testimony cannot serve as substantial evidence.

Any question whether the term "cash equivalents" was clear should also be foreclosed by the New Directions Bulletin's content, which treats certain kinds of notes as "cash equivalents" – they can fit in no other category – and does so by enunciating a standard that is far more restrictive than EITF Issue No. 85-1's previous formula: "substantial evidence of ability and intent to pay within a reasonably short period of time." (*Compare* Ex. 31-001 *with* RFJN, Ex. B at 49-50.) *That* EITF standard tracks closely with Mr. Dodge's approach – with "reasonable" extending out at least as far as two or three months according to

---

[48] (*See* Tr. 278:6-279:18, 282:13-285:6, 281:19-300:7 (Thompson); Tr. 515:18-517:18 (Dearden); Tr. 370:23-372:7 (Johnson).)

[49] Hildebrand also referenced OTS's Directors Responsibility Guides, but they contain no instructions on reconciling a commitment to infuse capital with post-period adjustments. (*Compare* Tr. 629:12-631:4 *with* RFJN, Exs. N & O, at 198-237.)

OTS's Mr. Scott – as well as his testimony about what he believed and why.[50]
Hildebrand's testimony also cannot be reconciled with the decision to send the
New Directions Bulletin to all thrift CEOs in February 2009 or the breadth of
OTS's internal distribution.  (*See* Tr. 671:8-18; RFJN, Ex. A at 24-25.)  There is
thus no substantial evidence concerning either the obviousness or general
awareness in 2007 of the standard ultimately adopted and then shared in early
2009.

### 2.     The Record Points in One Direction: Mr. Dodge Honestly Believed the Transactions Were Handled Properly

Every person who actually interacted with Mr. Dodge during the period that
the first three capital transactions were on the books provides the same testimony:
he believed that the bank's treatment was correct.  *See* supra at 20 n.21 (citing
testimony).  As OTS's Scott testified, upon finding out that OTS disagreed, Mr.
Dodge was surprised, but also immediately set about correcting matters.  (Tr.
801:14-18, 802:16-25, 822:2-12, 825:3-5.)  And then Mr. Dodge did so; not for $3
million, but rather for **$20 million**, an amount far over what OTS could demand.
(*See, e.g.*, Tr. 825:3-5.)  *See also* supra at 17-18.

---

[50] (*See, e.g.*, RFJN, Ex. B at 49-50; Ex. 11-004 (disclosure of June 2007 loan
participation); Tr. 809:15-810:16 (Scott); Tr. 859:19-864:2, 867:12-868:5, 871:19-
872:13, 878:19-879:6 (Dodge).)

### 3.     Mr. Dodge's Belief Was Reasonable and His Actions Completely Inconsistent with Scienter

It is undisputed that Mr. Dodge – who is not an accountant or lawyer – worked with people from such backgrounds as well as utilizing the experience that he gained from his 30+ years of successful stewardship. (*See, e.g.*, Tr. 515:12-516:2; *see also* supra at 9 n.10.)  There is also no *evidence* that he had been trained or been provided by OTS or any other source with the definition of "cash equivalents" provided by the OTS in January 2009.  Nor was there a place or authority where he could look up the purported standards and reconcile them with retroactive accounting precepts like "subsequent events" or post-closing adjustments.[51]  *See* supra at 9-11, 19-21 (citing participants' testimony); supra at 12-13, 22-23 (citing Coble's testimony); supra at 5-8 (citing New Directions Bulletin).

The evidence is also uncontradicted that Mr. Dodge believed his commitment for the holding company to cover these amounts, most reflected as

---

[51] (*See* RFJN, Ex. A at 27-28 (OIG: "We were aware of the policies and procedures reflected in the OTS Examination Handbook and TFR instructions. These policies and procedures did not include specific instructions relating to the circumstances described in this report, **and in turn, were not effective in preventing the backdated capital contributions discussed in this report.**") (emphasis added); *see also* RFJN, Ex. A at 22 ("… OTS had allowed other thrifts to record capital contributions in an earlier period than received and while there was some support in authoritative accounting literature for permitting this practice, that support was limited.").)

44

intercompany receivables on the books, combined with the financial health of the

holding company and the holding of money market assets with the bank was

sufficient to render the transactions "cash equivalents" at the time they were

recorded.   (*See, e.g.*, Tr. 863:17-864:14 (Dodge understanding); *see also* Tr.

417:11-16, 418:16-419:8, 441:8-10, 443:23.)   Nor was there any *evidence* that his

belief was unreasonable.  **Mr. Dodge acted on his belief that what ASB was**

**doing was proper by *disclosing it to OTS personnel*, and *OTS personnel acted***

***in a way that confirmed his belief* by raising no objection to his actions.**[52]  (*See,*

*e.g.*, Tr. 728:24-25, 809:17-24.)

      The Final Decision thus erred by improperly focusing on the wrong

question.  Instead of asking whether OTS actions were irrelevant to a rule's

abstract existence, it should have considered how OTS personnel's

communications of approval to Mr. Dodge might impact *his* state of mind, and thus

his potential culpability, concerning what the requirements were.  (*See* FD at 13;

RD at 30.)  Furthermore, OTS never established why a written promise to keep a

bank funded coupled with a transaction recording a specific receivable on ASB's

books is anything other than an enforceable promise to pay.  (*See* Ex. 17001; Ex.

---

      [52] It is telling how the New Directions Bulletin felt the need to address the
impact of an open capital commitment; the Final Decision erred in not doing the
same, effectively holding Mr. Dodge to a higher standard than the Inspector
General.  (*See* Ex. 31-002; *compare* FD at 13 *with* RFJN, Ex. A at 27-28.)

45

18-001-013)   This is odd given banking regulators' repeated efforts to argue that just such an open-ended promise to infuse capital results in unjust enrichment if not honored, even **without** a formal contract.[53]

### 4. There Was No Evidence that Mr. Dodge "With Full Knowledge" Manipulated the Capital Accounts or Exhibited Any Personal Dishonesty

The hearing was devoid of any evidence that Mr. Dodge was clairvoyant enough to anticipate OTS's 2009 rule.  With no OTS resources proclaiming its standard, no accountants apparently aware of it, and with confusion among OTS personnel, the conclusion that **Mr. Dodge** acted with "full knowledge" is not supported by substantial evidence.  (*See, e.g.*, RD at 42.)  Nor is there any evidence of personal dishonesty as neither the bank's books nor Mr. Dodge made any affirmative misstatements.[54]  The culpability findings thus violate the APA.

Contrary to what the ALJ implied, Mr. Dodge concedes that the delay between recording and reconciliation eventually took the initial capital transactions outside GAAP.  (*Compare* RD at 10 with RD at 15.)  While conceding some error,

---

[53]  *See, e.g., Wachtel, supra*, 982 F. 2d at 583.

[54]  The decisions also errs by applying the duty of candor – derived from a duty of loyalty – to the loan participation without establishing either self-interested benefits, or how the failure to disclose rose to anything more than arguable negligence in light of ASB's other disclosures.  (*See* FD at 7-9, 16, RD at 33-36, 40-42; *see also Michael v. FDIC*, supra, 687 F.3d at 349 (discussing duty of candor); *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1568 (Fed. Cir. 1984) (disclosure to PTO of prior art reference "inconsistent with intent to perpetrate fraud").

however, it is undisputed Mr. Dodge moved to correct it and to put millions **more** into ASB. *See supra* at 17. And neither any oversight in reconciling sooner or sharing with the board the delay in the loan participation can justify an inference of "personal dishonesty" where the *unpaid* transactions remained openly on the books and no actually *false* statements were identified. (*See* FD at 9, 16.) The disclosure to OTS, the proper accounting on ASB's books, and his honored belief that ASB was committed to paying these booked **receivables** is confirmed throughout the record, preventing any rational support for finding a disposition to lie or cheat. *See supra* at 11-12. There may have been a delay in payment, but again, another $17 million above and beyond the first $3 million demonstrates that such delay was, at worst, inadvertence.[55]

### 5.    The Final Decision Is Predicated on Accumulated Errors

Several improper leaps were made in the Final Decision. One of them was to conflate the question whether the transactions ultimately violated GAAP with the very different question whether Mr. Dodge *knew* this to be the case or that it was so obvious that it must rise far beyond negligence. (*See, e.g.*, FD at 13, 16; RD at 20-30.) Another error – repeatedly demonstrated – is using "the clarity of ex

---

[55] The evidence is that Mr. Dodge proceeded *as expeditiously if not more so* than either the auditor or Scott. (*Compar*e supra at 17-18 *with* supra at 12-13, 22-23(auditor fails to follow up), supra at 14, 24-25 (Scott research).) Mr. Dodge's distraction due to the financial meltdown can thus support, at most, a negligence finding.

post facto examination" even though it "does not inform us as to [Mr. Dodge's] mental state at the time of the alleged infraction." *Doolittle*, supra, 992 F.2d at 1540.

One cannot, for example, use arguments from *December 2008* about the Mountain View transaction to conclude that Mr. Dodge was disregarding contrary accounting advice for transactions executed almost two years previously. (*See, e.g.*, FD at 14, RD at 29.) The same applies to finding improper motive for booking the *disclosed and at least tacitly approved by OTS* loan participation even *before* the participation came due, despite the disclosure it was being booked months before maturity.[56] (*Compare* FD at 3, 13 *with* Ex. 11-004.) Yet that is what the Final Decision has done.[57]

Ultimately, within two weeks of OTS's decision that the three transactions were improper, ASB, Mr. Dodge, and ASB's holding company had: (a) reversed the transactions; (b) infused sufficient capital to counteract the reversal; and (c) infused millions more. *See* supra at 17 (citing testimony). This evidence is

---

[56] *See Hutensky v. FDIC*, 82 F.3d 1234 (2d Cir. 1996) ("The fact that the sale later fell through does not mean that Hutensky's statements on August 27th were misrepresentations"); *cf. also Advent Electronics, Inc. v. Buckman*, 918 F. Supp. 260, 265 (N.D. Ill. 1996) (broken promises by themselves do not establish promissory fraud).

[57] Moreover, there was no record of any disagreement regarding the handling of the first three capital transactions until the May 2008 audit. (*Compare* supra at 9-13, 14, 19-23 *with id.* at 12-13, 22-23.) The finding of disagreement prior to the audit -- at the time of booking -- is without substantial evidence. (*See* FD at 13.)

consistent with Mr. Dodge's own testimony that he viewed each transaction as predicated not on some external event (e.g., sale of the Muirlands property), but on the pre-existing commitment of ASB's holding company; a position in line with banking authorities' stated goals for directors.  (Tr. 417:11-16, 418:6-419:8, 441:8-10, 443:23, 863:17-864:14.)  Any lingering doubt about Mr. Dodge's state of mind – and the evidence leaves no such room – is conclusively dispelled by Mr. Dodge's involvement in infusing more cash into ASB than the maximum legal requirement.  Such actions should be *encouraged* by regulators rather than punished, with education like the New Directions Bulletin favored over the hammer of coercive action.[58]

### 6.    The Mountain View Ruling Suffers the Same Fatal Flaws

Just as there was reasonable confusion regarding the handling of the initial three capital transactions, the same is true of the Mountain View loans.  It is undisputed that, following the new accounting rules, ASB was recording unrealized revenue from its still-contingent loan pipeline as earnings.  *See supra* at

---

[58] Lurking in the background are concerns over the potential role of politics in OTS's entire approach.  (*See, e.g.*, Tr. 87:13-88:2, 125:2-7, 324:2-11, 613:19-22, 835:13-840:15, 867:22-25.)  Given recent events, the fact that the loan participation involved the Republican Party and the subsequent investigation by the FEC raised the troublesome specter of political targeting. *See, e.g.*, http://www.treasury.gov/tigta/auditreports/2013reports/201310053fr.pdf (accessed, June 1, 2013) (report of Inspector General finding IRS targeting of "conservative" groups).  This is reinforced by the seizure of the bank just before a purchase was to close.  (Tr. 893:5-16.)

49

14. (*See also, e.g.*, Ex. 11-004.) ASB disclosed this to OTS without objection, and most such transactions have not been challenged.[59] Further, all those involved testified that Mountain View was handled consistently with other mortgages, with an implicit question being whether the course of conduct between Mountain View and ASB rose to the level of a binding contract.[60]

While there were some factual differences between the Mountain View mortgages and the others that ultimately impacted the GAAP analysis, the Mountain View loans were all worked while the market for mortgages was collapsing. (See Tr. 607:6-13; Ex. 22-002.) Mr. Dodge's consistent defense that other mortgages in the pipeline were treated similarly was confirmed by others and has never been rebutted. *See* supra at 14-16, 21-23 (citing testimony). Nor did Mr. Dodge "hide" the potential lack of an executed contract with Mountain View, stating clearly to the Board when asked that he did not know, but that the issue needed to be confirmed one way or another. (*See, e.g.*, FD at 4; *see also* OTS Ex. 16-001.) Again, there is no evidence establishing *scienter*, particularly given Mr. Dodge's contemporaneous infusion of $20 million into ASB just as this transaction

---

[59] (*See, e.g.*, Ex. 11-004; Tr. 523:22-524:1, 533:11-534:11 (Dearden); RFJN, Ex. G at 117, 122 (OTS mortgage accounting guidance).) Despite this unchallenged approach, both the FD and RD erroneously focused on realization as an accounting requirement. (*See* RD at 25, FD at 9.)

[60] (*See, e.g.*, Tr. 393:5-23, 405:2 (Johnson), 523:8-15 (Dearden); *see also* Tr. 607:6-13; Ex. 22-002 (activity on loans); Tr. 274:24-275:1, 536:3-5, 605:607:4 (testimony re: contracts not reduced to a writing).)

first appeared on ASB's Thrift Financial Report. (*Compare, e.g.*, Ex. 18-003-004 (infusions) *with* Tr. 589:17-24 (booking).)

The Final Decision does not grapple with the evolving accounting standards allowing for booking unrealized income demonstrated in the record or the regulatory uncertainty exemplified by OTS's own "experts" and their differing testimony. *See* supra at 9 n.13, 14-16, 25 n.34. (*See also* RFJN, Ex. H at 143, 146.) Nor does the Final Decision properly address Mr. Dodge's reasonable reliance on the advice of trusted advisors and the acquiescence of regulators, or address his subsequent commendable actions to explain how these honest mistakes – in various forms also made by OTS personnel – somehow become "intentionally" misleading or even "reckless."[61] *See* supra at 17-18, 19-26. This was improper under the APA. *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (2011) (agencies have obligation to acknowledge and account for changed postures).

These errors are particularly problematic given the inconsistent sworn statements made by OTS personnel, such as Scott's declaration stating broadly (and incorrectly) that June 23, 2008 "was the first time Dodge had ever brought up

---

[61] (*See, e.g.*, Ex. 11-004 (revealing recognition of unrealized income); Tr. 228:24-229:11 (Lay) (no objections from OTS). *See also* supra at 15 n.17, 25-26 n.33, 42 n.48 (comparing OTS stated approach in regulatory bulletin and factual record with contrasting "expert" testimony).

51

the issue of non-cash capital."[62]  Further, Scott's testimony about IndyMac and Hildebrand's testimony about how "well established" the standards were is also irreconcilable with Scott's testimony about no concern over the loan participation as originally disclosed.[63]   Even the Final Decision contains plainly erroneous statements such as "Respondent failed to disclose that the inter-company receivable placed on the Bank's books . . . involved a valueless asset that the Bank had already written off …," when the 2007 Capital Plan clearly states:  "The holding company contributed a $2 million participation in a loan due to be paid in June 2007 and **purchased a $400,000 charged off loan from the bank**."  (*Compare* FD at 9 *with* Ex. 11-004.)

### 7.    Conclusion

The Petition here is part of a chain of cases where similar results had to be set aside.  *See Doolittle*, supra, 992 F.2d at 1540 (petition granted where a president might "have done more to prevent" a bank's exposure from increasing, but "[w]hen he discovered that his actions were insufficient . . . he informed the board of directors . . . and took immediate actions to limit [the bank's] losses.");  *Oberstar v. FDIC*, 987 F.2d 494, 503-504 (8th Cir. 1993) (petition granted where the denials of intent to violate an FDIC order were "plausible" and "any violation"

---

[62] (*Compare* Br. in Supp. or OTS's Mot. for Summ. Disposition, Ex. 26, ¶ 8 *with* Tr. 810:8-16.)

[63] (*Compare* Tr. 801:4-9 (IndyMac), 670:8-11 ("well established") *with* Tr. 809:17-24 (Scott); *see also* RFJN, Ex. A at 21-24, 27-28, 44.)

was either "technical" or "inadvertent."); *see also Kim v. OTS*, 40 F.3d 1050, 1055

(9th Cir. 1994) (granting petition "[d]espite the OTS's vehement use of such

colorful words as 'egregious'...."). While Mr. Dodge at all times took seriously

the applicable regulations, the cumulative impact of the Final Decision's many

errors prevents any finding of culpability; the contrary finding violates the APA.

### C.     All The Misconduct Determinations That Rely on Scienter or Duty Determinations Also Suffer From the Same Fatal Problems

Many of the misconduct findings under 12 U.S.C. § 1818(e) suffer from the

same fatal flaws identified above concerning: (a) Mr. Dodge's state of mind; and

(b) the scope of OTS's regulations at the time. (*See generally* FD at 6-8; RD at 22-

36 (analysis repeatedly predicated on state of mind and alleged clarity of rules.)

Because the various strands of this error infect so much of the analysis, the Petition

should be further granted as to the misconduct findings.

### 1.     All Misconduct Findings Requiring a Culpable State of Mind Were Improper Under the APA

The Final Decision purports to find that Mr. Dodge's actions in agreeing on

behalf of ASB's holding company to inject capital and then doing so – albeit not as

quickly as OTS prefers – amounts to a *crime* under 18 U.S.C. § 1005. (*See* FD at 3

(agreement), 5-6 (funding and finding).) As both 18 U.S.C. § 1005 and 12 C.F.R.

§ 163.180(b)(1) require the same or higher levels of culpability discussed above,

these findings also violate the APA. *See* supra at 39-53. Similarly, the findings

concerning whether any actions were "unsafe or unsound" are predicated on "falsification of bank records" – a finding that cannot be made on this record.  (*See* FD at 7; RD at 32.)

### 2.    Any Misconduct Findings Premised on OTS' Own Regulations or Other Publications Also Violate the APA

The Final Decision also purports to find misconduct premised, at least in part, on purported violations of Section 110 of the OTS Handbook and breach of the duty of care relating to the initial booking of the transactions.  (*See* FD at 6-7.) In both cases, these findings rely on the conclusion that there was "[p]lainly" or "clearly" a violation under the regulatory authorities as they existed in 2007.  (*See* FD at 15; RD at 30.)  But the law and the evidence as a whole establish that there was no such clarity.  *See* supra at 4-9, 14-17, 40-44, 49-52.  As a result, *all* the findings premised on these assumptions violate the APA and the Petition should be granted as to them (*See* FD at 6-9, 12-14, 16, 18; RD at 22-25, 28-36, 40-42, 44-45, 49-51.)  *See also, e.g., Doolittle*, 992 F.2d at 1537 (no breach of fiduciary duty where a director made mistakes but corrected them on learning they were mistakes).

Nor could any arguable delay in reconciling the accounts receivable support a breach of fiduciary duty claim based on the duty of care where the capital transaction receivables were paid in full along with millions more in capital injections.  *See* supra at 17-18, 40-41, 44-47, 52-54.  The same holds true for the

54

findings regarding breach of the duty of candor, which is predicated on a duty of loyalty to the bank and requires a situation where one "may derive a personal benefit." *See Seidman v. OTS*, 37 F.3d 911, 935 n.34 (3rd Cir. 1994). Here, as discussed above, there was no "personal benefit" nor was one possible with adequate funds sitting at the bank (of which $7.5 million were also ultimately used). *See* supra at 11-13, 17-18, 36-40.

Further, any mistakes in not reporting more were premised on: (1) Mr. Dodge's reasonable subjective belief that the holding company's written commitments to ASB; (2) his intention to honor them; (3) the holding company's ability to do so; (4) the openness of the transactions on the bank's books; and (5) all confirmed by Mr. Dodge's subsequent fulfilling of these obligations. *See* supra at 10-13, 18. Such mistakes do not reflect a "breach of the sacred trust owed by a fiduciary" and thus cannot support the misconduct findings. *See Doolittle*, 992 F. 2d at 1537; *see also* supra at 52-53. These additional violations of the APA further support granting the Petition.

## X.    NEITHER THE LAW NOR SUBSTANTIAL EVIDENCE SUPPORTS THE CIVIL MONETARY PENALTIES

The civil monetary penalty also violates the APA. Under 12 U.S.C. § 1818(i)(2)(B), before a Tier 2 penalty can imposed, a party must commit one of the acts listed in subsection (i), and such action also must either be part of a pattern of misconduct; cause or be likely to cause more than minimal loss to an institution; or

result in pecuniary gain or other benefit to the party.  12 U.S.C. § 1818(i)(2)(B)(ii)(I-III).

As discussed above, the analogous misconduct, culpability, or effect findings required under 12 U.S.C. § 1818(i) cannot be made.  *See* supra at 32-55.  Any contrary findings thus violate the APA.  *Id.*  Additionally, there is no "pattern of misconduct;" there are only accounting errors during a time of uncertainty that were reversed, resolved and then even more money was infused.  *See* supra at 39-55.  Further, even if all such findings could survive review (and they cannot), the failure to take adequate account of the $20 million injected into ASB as a mitigating factor renders the amount awarded arbitrary and capricious.  (*See* FD at 18; RD at 47-48.)

> A.     **The Final Decision Cannot Be Reconciled with 12 U.S.C. § 1818(i)(2)(B)(ii)'s Effect Requirements or the Evidence as a Whole**

In a fashion similar to 12 U.S.C. § 1818(e)(1), two of the three pre-conditions before a civil monetary penalty can be imposed – even after a finding of misconduct under one of its three tests (which are effectively challenged by the Petition) – have an "effect" element.  *See* 12 U.S.C. § 1818(i)(2)(B)(ii)(II) (requiring that act "causes or is likely to cause more than a minimal loss"); 12 U.S.C. § 1818(i)(2)(B)(ii)(III) (requiring "pecuniary gain or other benefit").  But just as with the prohibition order, neither element can be met as none of the challenged transactions either caused any harm or was **likely** to cause any harm to

56

ASB, particularly once the $20 million capital infusion is properly taken into account. *See supra* at 17, 33-36.  Further, Mr. Dodge received no gain, pecuniary or otherwise. *See supra* at 36-40.

**B.**   **The Final Decision Cannot Be Reconciled with 12 U.S.C. § 1818(i)(2)(B)(i)'s Misconduct Requirements or the Evidence as a Whole**

Additionally, no penalties can be imposed under 12 U.S.C. § 1818(i) absent, at a minimum:  (1) a violation of a law or regulation; (2) recklessly engaging in an unsafe or unsound practice; or (3) breaches of fiduciary duties.  *See* 12 U.S.C. §§ 1818(i)(2)(B)(i)(I)-(III).  With the exception of the recklessness requirement, these provisions largely track those governing prohibition orders.  *See* 12 U.S.C. § 1818(e). (*See also* RD at 44.)  Accordingly, the improper assumptions about GAAP, the scope of the OTS's regulations, and the scope of options available to someone in Mr. Dodge's position in 2007 that infect the prohibition order findings are all found here as well.  *See* supra at 40-52.  When these APA violations are coupled with the inability to find the requisite states of mind or to get past Mr. Dodge's infusion of $20 million into ASB, they also require the Petition to be granted as to the misconduct findings underlying the civil monetary penalties.  *See* supra at 53-55.

Similarly, the requirement of recklessness, no matter how understood, further prevents any finding of misconduct as it relates to the "unsafe and

unsound" element of 12 U.S.C. § 1818(i)(B)(2)(i)(II).[64]  *See* supra at 40-51.  Under

the actual circumstances faced by Mr. Dodge and ASB as they developed, neither

the rules and regulations were sufficiently clear to support any heightened findings

regarding culpability, particularly given OTS's own actions.  *See* supra at 40-43.

### C.    Without Multiple Misconduct Findings, There Can Be No "Pattern of Misconduct"

Without misconduct findings related to either or all: (1) the loan

participation or the $400,000 receivable after disclosure to OTS; (2) the additional

$750,000 in receivables at year-end; or (3) the Mountain View transaction, there

can also be no "pattern of misconduct" under 12 U.S.C. § 1818(i)(2)(B)(i)(I).  This

is particularly true when the $20 million capital infusion is taken into account, as it

must.  *See* supra at 17-18.

### D.    The Civil Monetary Penalty Is Rendered Arbitrary and Capricious in Light of the $20 Million Capital Injection

It may be rare that an agency's weighing of remedies can be upset under the

APA's normally lenient standards.  This, however, is one of those times.  At

bottom, Mr. Dodge personally caused the holding company, at great personal

expense, to put into ASB not just the $3 million or so in capital to reverse the

transactions, but also in excess of $17 million more.  *See* supra at 17-18.  Neither

---

[64] *See* supra at 39-40; *see also Simpson v. OTS*, 29 F.3d 1418, 1425 (9th Cir. 1994).

OTS nor the OCC ever acknowledges that these amounts are **more than the legal limit that they can ask *anyone* to inject** into an institution. *See* 12 U.S.C. § 1831o(e)(2)(E); *see also* supra at 17-18 n.19. Combined with Mr. Dodge's losses stemming from the unnecessary and questionable receivership that stopped the sale of ASB from closing, (Tr. 892:20-893:18), any further monetary punishment is simply irrational. The Petition should be granted.

## XI. CONCLUSION

For all the reasons above, Mr. Dodge respectfully requests that this Petition be granted and the Final Decision be vacated in its entirety.

DATED: June 20, 2013                PAYNE & FEARS LLP


By:  _____/s/ Thomas L. Vincent_____
                THOMAS L. VINCENT

        Counsel for Petitioner LAWRENCE K.
        DODGE

Dodge Opening Brief Rev. Short Version(4).docx

# CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and District of Columbia

Circuit Rule 32, the attached Petitioner's Opening Brief is proportionately spaced,

has a typeface of 14 points or more and contains 13,900 words (according to the

Microsoft Word word count function).

DATED: June 20, 2013                PAYNE & FEARS LLP


                        By: _____ /s/ Thomas L. Vincent _____
                                THOMAS L. VINCENT

                        Counsel for Petitioner LAWRENCE K.
                        DODGE

## CERTIFICATE OF SERVICE

  I hereby certify that a copy of the foregoing **PETITIONER'S OPENING BRIEF** has been sent this 20th day of June, 2013 by overnighting a copy thereof to the following persons:

Douglas Bradford Jordan
Gabriel A. Hindin
Office of the Comptroller of the Currency
Department of the Treasury
250 E. Street S.W.
Washington, D.C. 20219
douglas.jordan@occ.treas.gov
gabriel.hindin@occ.treas.gov

Douglas Bradford Jordan
Gabriel A. Hindin
United States Department of the Treasury
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, D.C. 20219
douglas.jordan@occ.treas.gov
gabriel.hindin@occ.treas.gov

June 20, 2013

Susanne Zimmerman
Payne & Fears LLP
4 Park Plaza, Suite 1100
Irvine, CA  92614
(949) 851-1100

4846-4961-7172.1